(201 P.3d 752)
No. 98,449

STATE OF KANSAS, *Appellee,* v. TYLER C. PENN, *Appellant.*

Opinion filed February 27, 2009.

*Rachel Pickering*, of Kansas Appellate Defender Office, for appellant.

*Kristi L. Barton*, assistant district attorney, *Nola Tedesco Foulston*, district attorney, and *Stephen N. Six*, attorney general, for appellee.

Before ELLIOTT, P.J., GREEN and MARQUARDT, JJ.

GREEN, J.: Tyler Penn appeals from his jury trial convictions and sentences for four counts of rape and one count of sexual battery. Penn first argues that the trial court erred in excluding evidence of victim N.R.'s dishonesty. We disagree. Because Penn never es-

tablished a sufficient foundation to introduce opinion testimony and evidence of N.R.'s general reputation for untruthfulness in the community where she lived under K.S.A. 60-446, the trial court properly excluded the evidence at trial. Next, Penn contends that the prosecutor's questioning of him during cross-examination, which violated the trial court's order in limine, constituted prosecutorial misconduct. We again disagree. Although the prosecutor's questioning was a violation of the order in limine, the record demonstrates that the violation did not substantially prejudice Penn.

Next, Penn maintains that the trial court erred in assessing attorney fees against him by failing to consider his financial resources or the burden those fees would impose on him, as required by K.S.A. 22-4513. We agree. Based on *State v. Robinson*, 281 Kan. 538, 132 P.3d 934 (2006), we remand the case with directions for the trial court to comply with K.S.A. 22-4513 concerning the assessment of attorney fees. Finally, Penn contends that the trial court erred in using his criminal history to increase his criminal history score. We disagree. Because Penn's argument is controlled by *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002), we are unable to grant him relief on this issue. Accordingly, we affirm Penn's convictions; we vacate the portion of his sentences assessing attorney fees; and we remand the case to the trial court with directions to comply with *Robinson* and K.S.A. 22-4513 concerning the assessment of attorney fees.

On the afternoon of April 18, 2006, N.R., a 17-year-old student at North High School, walked into the office of the school counselor, Jan Knabe, just after the lunch period had ended and asked to call her foster mother. N.R. had a speech impediment and hearing problems and received special education services at North High School. Knabe noticed that N.R. was trembling, that N.R.'s shoulders were shaking, and that N.R. was beginning to cry. When Knabe asked N.R. why she wanted to call her foster mother, N.R. asked if an 18-year-old person could get into trouble for having sex with a 17-year-old girl.

Knabe told her that it depended upon whether both people agreed to it. N.R. stated that she did not agree to it. Knabe then

called the school administrator and N.R.'s foster mother, R.H. The police were notified about the alleged rape.

N.R. told Knabe that she thought she was going to hang out with Penn, but he made her have sex with him. N.R. said that Penn had not worn a condom and she was worried that she might become pregnant. Knabe testified that when N.R. was describing the incident, she was wringing her hands and crying and had to stop talking a few times in order to catch her breath. When R.H. got to Knabe's office, she noticed that N.R. was visibly upset and was sitting in a chair in the fetal position.

### N.R.'s Police Interview in Knabe's Office

Officer Stephanie Hosmer was sent to Knabe's office to investigate the alleged rape. Hosmer testified that upon speaking with N.R., she could tell that N.R. was somewhat mentally challenged. N.R. told Hosmer that she had been in the hallway at school that day when a classmate named Tyler, whom N.R. later identified as Penn, asked her if she wanted to come with him to his "cousin's" house and "hang out." N.R. and Penn were in two classes together, graphic arts and United States history. N.R. told Hosmer that she thought she and Penn were going to just watch television and "hang out." N.R. and Penn walked to a grocery store, where Penn's "cousin" picked them up and drove them to her apartment. It was later discovered that the girl who picked them up was not Penn's cousin but was Penn's close friend, Shineta Horton.

N.R. told Hosmer that as she and Penn were walking up the stairs to the apartment, N.R. hesitated and Penn put one hand on her shoulders and one hand on her waist and guided her up the stairs. After they got inside the apartment, Penn took N.R. upstairs to a loft area. Penn sat down and pulled N.R. down on his lap. Penn then asked N.R. if she liked looking in a mirror. N.R. said that she told Penn yes, but she was unsure of what Penn was talking about. N.R. told Hosmer that there was a mirror resting on the floor of the loft.

N.R. told Hosmer that Penn asked her if she wanted to see his penis. N.R. told Penn no, but Penn unzipped and pulled down his pants. Penn then took N.R.'s hand and put it on his penis. Although

Penn tried to keep N.R.'s hand on his penis, N.R. pulled her hand away. When N.R. stood up, Penn grabbed her waist and started to unbutton and unzip her pants. N.R. said that she told Penn, "Please don't," but he pulled down her pants.

N.R. said that Penn told her several times to take off her clothes and shoes. N.R. told Hosmer that she felt like she had no choice but to do what he said. N.R. took off her pants. Penn told N.R. to lay down. Penn then took off N.R.'s underwear and told her that the first time would hurt. Penn tried to put his face between N.R.'s legs, but N.R. told him she did not want to do that and closed her legs. N.R. told Hosmer that Penn kissed and bit both of her breasts. N.R. stated that Penn then "shoved his dick in my crotch." N.R. told Hosmer that the vaginal intercourse lasted about 15 to 20 minutes, during which Penn kept repeating that it would hurt.

According to Hosmer, N.R. stated that she told Penn, "[P]lease stop, it's hurting me." Penn then told N.R. that they were going to try a new thing. Penn laid on his back, grabbed N.R. by the hands, and told her that he wanted her to "suck his dick." N.R. told Penn that she did not want to do that. Penn then told N.R. to turn around, and N.R. said that Penn put her on her hands and knees. N.R. said that Penn put his penis in her rectum. After a couple of minutes, Penn had N.R. get on her back again. N.R. stated that Penn again put his penis into her vagina. When N.R. told Penn to stop, he said to let him finish. Penn then pulled away and ejaculated on N.R.'s stomach.

N.R. told Hosmer that Penn leaned over the railing of the loft and called for Horton to throw him up some paper towels. Penn then wiped himself off with the paper towels, got dressed, and went downstairs. Penn came back upstairs with wet paper towels and cleaned her off. Penn told N.R. to put on her clothes. After N.R. got dressed, she and Penn walked downstairs and left the apartment with Horton. Horton drove N.R. and Penn back to the grocery store. When N.R. got out of the car, Penn gave her a hug and told her not to tell anyone about their business. Penn got back in the car with Horton, and N.R. walked back to school. Upon returning to school, N.R. went immediately to Knabe's office.

When Hosmer asked why N.R. had reported the incident, N.R. stated that she was a good girl and that she did not want to keep any secrets from her foster mother. N.R. told Hosmer that she and Penn were not boyfriend and girlfriend and had never talked about dating. N.R. said that she did not want to go back to school because she was afraid of retaliation. N.R. stated that she was upset because she was supposed to be going to prom and had purchased a prom dress but no longer wanted to go.

## Identification of Penn

After describing the incident to Hosmer, N.R. agreed to undergo a sexual assault examination and to show Hosmer where Horton's apartment was located. As they were driving through the parking lot of the apartment complex, N.R. pointed out the vehicle that Horton had been driving. As N.R. was pointing out Horton's apartment, a black male later identified as Penn came out of the door of the apartment complex. When N.R. saw Penn, she stated, "That's him, that's him," and then ducked down in her seat. Hosmer called back to the officers who were following her through the parking lot and told them that N.R. had identified Penn.

## Evidence at Horton's Apartment

Immediately after Penn was arrested, Horton consented to the search of her apartment. Horton told an investigating officer that she had assumed that N.R. was Penn's girlfriend. Horton said that there had been no public display of affection between N.R. and Penn in her presence, but she assumed that Penn and N.R. had engaged in sexual intercourse while they were upstairs.

Inside Horton's apartment, crime scene investigators located and collected used paper towels. In addition, the investigators observed a reddish-brown stain on the carpet in the loft area. This stain was located in the area where N.R. had described the incident taking place.

## Sexual Assault Exam Evidence

Jennifer Dyck, a sexual assault exam nurse, examined N.R. around 4:15 p.m. on April 18, 2006. As part of her examination, Dyck learned that N.R. was on four different prescribed medica-

tions, including Zoloft, Abilify, Trileptal, and Seroquel. Upon talking with N.R., Dyck noticed that N.R. had slower intellectual functioning skills and a speech impediment. Moreover, Dyck noticed that N.R. spoke in broken sentences. Dyck testified that it was necessary for her to be very concrete and specific with N.R. about what Dyck needed to know.

When Dyck questioned N.R. about her level of pain during the alleged incident, N.R. stated that her pain was at a level 10 (out of 10) when Penn put his penis in her vagina the first time. N.R. said that her pain was at a level 3 during the anal intercourse. N.R. told Dyck that her pain was at a level 8 during the second vaginal intercourse. N.R. further told Dyck that she was experiencing lower abdominal pain during the examination. N.R. rated her pain at the time of the examination at a level 2 or 3.

During the sexual assault examination, Dyck found a partial tear to N.R.'s hymen that was actively bleeding. There was also an abrasion and purple and red bruising to the hymen. In the space between the anus and the female sex organ, Dyck discovered a 2.5 millimeter laceration. Dyck further discovered a jagged-edge tear to N.R.'s cervix. Dyck testified that injuries to the cervix are rare and that a tear would indicate a significant amount of force. According to Dyck, the sexual assault program at the hospital had been in existence since 1994, and they saw about 400 patients each year. Out of all those patients, Dyck estimated that only about 10 had any cervical injury. Dyck testified that N.R.'s injuries were consistent with blunt force trauma.

*DNA Evidence*

Following N.R.'s sexual assault examination, officers obtained a search warrant to collect bodily fluids from Penn. Presumptive testing on the swabs collected from Penn's penis, scrotum, and left hand indicated the presence of blood. Testing on the swabs from N.R.'s lower abdomen confirmed the presence of semen. In addition, presumptive testing of the vaginal and anal swabs collected from N.R. indicated the possible presence of blood. A presumptive test on the swabs from N.R.'s breasts indicated the possible presence of saliva. The DNA profile found on the swabs from N.R.'s

abdomen was consistent with the DNA profile of Penn. Moreover, the DNA mixed profile found on the penis swabs of Penn was consistent with the combined profiles of N.R. and Penn.

*N.R.'s Interview on the Evening of the Incident*

Detective Lisa Walker interviewed N.R. on the evening of April 18, 2006. According to Walker, when N.R. began to describe the incident at Horton's apartment, N.R. brought her knees up to her chest and rolled herself into a ball. Walker testified that N.R. told her that she felt like she was partly responsible for what had happened. According to Walker, N.R. started blaming herself because she had had uneasy feelings about going with Penn.

Penn went to trial on charges of one count of sexual battery in violation of K.S.A. 21-3517; three counts of rape by force or fear in violation of K.S.A. 2005 Supp. 21-3502(a)(1)(A) with alternative counts of rape when the victim is incapable of giving consent in violation of K.S.A. 2005 Supp. 21-3502(a)(1)(C); one count of rape when the victim is incapable of giving consent in violation of K.S.A. 2005 Supp. 21-3502(a)(1)(C) with no alternative count; and one count of aggravated criminal sodomy by force or fear in violation of K.S.A. 2005 Supp. 21-3506(a)(3)(A) with an alternative count of aggravated criminal sodomy when the victim is incapable of giving consent in violation of K.S.A. 2005 Supp. 21-3506(a)(3)(C).

*N.R.'s Testimony*

Consistent with her earlier statements, N.R. testified that she told Penn several times during the incident that it hurt and to stop. N.R. testified that she never yelled for help during the incident, but that she was hurting and was crying inside. N.R. testified that she did not agree to have sexual intercourse with Penn.

*Additional Evidence by the State*

R.H., who was N.R.'s foster mother from February 2006 to July 2006, testified that N.R. never told her that she had agreed to any of the sexual activity with Penn. According to R.H., N.R. was lower functioning, had a hard time understanding what people were communicating to her, and had the maturity level of a 13-or 14-year-old child. R.H. testified that N.R. had been on several different

medications, one of which was for hallucinations, when N.R. lived with her. According to R.H., N.R. was impressionable and wanted the boys to like her but did not know how to accomplish that.

*Penn's Testimony*

During his testimony at trial, Penn admitted that he and N.R. had engaged in sexual intercourse at Horton's apartment on April 18, 2006. Nevertheless, Penn testified that the sexual intercourse was consensual and that N.R. had initiated the sexual activity. According to Penn, while they were waiting for Horton to pick them up at the grocery store, he and N.R. were flirting and hugging each other. Penn testified that he asked N.R. if she had ever been intimate with anyone and she responded that she had not. Penn further testified that he asked N.R. if she was curious about doing anything intimate and that N.R. had responded that she was very interested.

According to Penn, after they arrived at Horton's apartment, he asked N.R. if she wanted to see Horton's artwork. Penn then walked upstairs, and N.R. followed him. Penn sat on a folding chair, and N.R. came over and sat on his lap. Penn then put his arm around N.R.'s waist, and they started kissing. Penn testified that N.R. put her hand on his jeans in the area of his penis. According to Penn, N.R. got on her knees and he pulled his penis out of his jeans. Penn testified that N.R. then grabbed his penis.

Penn testified that he asked N.R. if she was still interested in having sex with him, and N.R. responded, "Sure." Penn then asked N.R. whether she was a virgin by lack of opportunity or because she wanted to remain a virgin. According to Penn, N.R. responded that she had never had the opportunity. Penn told N.R. that she had lots of opportunity now and asked what was holding her back. N.R. responded, "Nothing." According to Penn, he told N.R. that they could not have sex with their clothes on, so N.R. took off her clothes. Penn testified that he then engaged in sexual intercourse with N.R., first on top of her, then underneath her, then behind her, and then on top of her again. Penn testified that he never penetrated N.R.'s rectum.

Penn testified that N.R. never told him to stop and never pulled away from him. Moreover, Penn testified that N.R. never indicated that he was hurting her. Penn testified that when he and Horton dropped off N.R. at school, he and N.R. hugged and kissed. Penn denied telling N.R. to remain quiet about the situation.

After a 3-day trial, the jury found Penn guilty of all the charges, including the alternative counts, except for the charge of aggravated criminal sodomy. The jury acquitted Penn of the charge of aggravated criminal sodomy. Penn was sentenced to a controlling sentence of 166 months in prison.

*I. Did the trial court err in excluding evidence of N.R.'s dishonesty?*

First, Penn contends that the trial court committed reversible error by preventing him from presenting opinion and reputation testimony of N.R.'s dishonesty, which violated his right to present a complete defense. Under the Kansas and United States Constitutions, a criminal defendant has a right to present the theory of his or her defense. The exclusion of evidence that is an integral part of that theory violates a defendant's fundamental right to a fair trial. *State v. White*, 279 Kan. 326, Syl. ¶ 3, 109 P.3d 1199 (2005). Whether a defendant's constitutional rights have been violated is a question of law over which an appellate court exercises unlimited review. See *State v. Chambers*, 36 Kan. App. 2d 228, 232, 138 P.3d 405, *rev. denied* 282 Kan. 792 (2006). Nevertheless, the right to present a defense is subject to statutory rules and case law interpretation of rules of evidence and procedure. *State v. Evans*, 275 Kan. 95, 102, 62 P.3d 220 (2003).

When reviewing a trial court's decision to admit evidence, an appellate court first determines whether the evidence is relevant. Once relevance is established, an appellate court applies the evidentiary rules governing the admission and exclusion of evidence as a matter of law or in the exercise of the trial court's discretion, depending on the contours of the evidentiary rule question. When the issue involves the adequacy of the legal basis for the trial court's decision, appellate courts apply a de novo standard. *State v. Moore*,

39 Kan. App. 2d 568, 583-84, 181 P.3d 1258, *rev. denied* 286 Kan. 1184 (2008).

K.S.A. 60-420, which governs the admissibility of evidence affecting credibility, states:

"Subject to K.S.A. 60-421 and 60-422, for the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence concerning any conduct by him or her and any other matter relevant upon the issues of credibility."

K.S.A 60-422 limits the admissibility of evidence affecting the credibility of a witness. Some of the limitations under K.S.A. 60-422 are:

"As affecting the credibility of a witness . . . (c) evidence of traits of his or her character other than honesty or veracity or their opposites, shall be inadmissible; (d) evidence of specific instances of his or her conduct relevant only as tending to prove a trait of his or her character, shall be inadmissible."

In *State v. Lewis*, 252 Kan. 535, 536-37, 847 P.2d 690 (1993), our Supreme Court explained the limitations imposed by K.S.A. 60-422:

"In substance K.S.A. 60-422(c) disallows proof of general bad or good character and limits character evidence impeaching or supporting a witness's credibility to the traits of honesty or veracity or their opposites. K.S.A. 60-422(d), on the other hand, limits the manner of proving such character traits as affecting the credibility of a witness by disallowing evidence of specific instances of the witness's conduct. This limits K.S.A. 60-446, which allows proof of character by opinion testimony and evidence of reputation.

" 'Thus, a witness's credibility may be attacked by showing the witness has character traits for dishonesty or lack of veracity, but those traits may only be proven by opinion testimony or evidence of reputation. Those traits may not be proven by specific instances of the witness's past conduct. [Citations omitted.]' "

As explained in *Lewis*, K.S.A. 60-446 allows proof of character by opinion testimony and evidence of reputation. In addition, K.S.A. 60-446 allows evidence of specific instances of the person's conduct, but that is limited by K.S.A. 60-447:

"When a person's character or a trait of his or her character is in issue, it may be proved by testimony in the form of opinion, evidence of reputation, or evidence of specific instances of the person's conduct, subject, however, to the limitations of K.S.A. 60-447 and 60-448." K.S.A. 60-446.

K.S.A. 60-447(a) limits the admissibility of evidence of specific instances of the person's conduct to those that resulted in a criminal conviction: "[E]vidence of specific instances of conduct other than evidence of conviction of a crime which tends to prove the trait to be bad shall be inadmissible."

*Evidence Pertaining to N.R.'s Credibility*

After the first trial had commenced in this case, the prosecutor turned over to defense counsel an email she had received from Jennifer Mackey, one of N.R.'s caseworkers from Youthville, concerning N.R. The prosecutor had emailed Mackey for help in ensuring N.R.'s appearance in court. A portion of the response email from Mackey read as follows:

"[N.R.] is one of the greatest manipulators, and has learned that she can lie and make up accusations to get her way. It has worked for her every time.

"I don't mean to sound harsh, but this girl has done so many things to harm other people's life, and she has no remorse. It is all about [N.R.]

"[N.R.] is not as slow and as needy as she comes across. She plays that a great deal. She knows what she is doing. She is lazy and wants to do what she wants for attention.

"Myself and my colleague ha[ve] had her on our caseloads for over three and-a-half years, so we know this kiddo well."

The trial court granted a mistrial in order to give defense counsel sufficient time to adequately investigate the new development. The second trial was then held several weeks after the mistrial occurred.

Several days before the second trial, the trial court held a non-evidentiary hearing to determine the admissibility of testimony from Mackey and Amanda Pope, another one of N.R.'s Youthville caseworkers, to discuss the contents of the email. Penn argued that the email fell under opinion testimony and evidence of reputation. Determining that the email was inadmissible, the trial judge stated:

"I'm not going to allow it. Here's why. Because the employees at Youthville are basing their comments on what other people have said to them.

"Believe me, having been a foster parent for many years, I know that very little of the firsthand information, very much of the information that these people get is not firsthand.

"I will certainly consider testimony that these people may have based on their own personal observation. But conclusions based on hearsay . . . are definitely not admissible."

In responding to the trial court's ruling, Penn told the trial court that Mackey and Pope would be testifying only about their personal interactions with N.R.:

"[Defense counsel:] And what we're offering is, they wouldn't be testifying as to any hearsay, they would be talking about their own personal interactions over that three and-a-half year time period with the alleged victim in this case.

"And we would ask for an opportunity to proffer that."

Noting that the proffer based on Mackey's and Pope's personal information would be allowed, the trial judge stated:

"I'll let him make the proffer, absolutely, but the proffer has to be made based on their own personal information, not on—this is just, it's a game of telephone where, you know, the stories get repeated over and over, and they lose their link to reality, I think, the more it gets repeated.

"So, if you want to proffer their testimony at the time of trial, then, yes, I will definitely allow that."

On February 27, 2007, the first day of the second trial, the trial court held a proffer hearing outside the presence of the jury. At the hearing, Mackey testified that she had been at Youthville since November 2005. Nevertheless, it was not until June 2006 that N.R. became a part of Mackey's caseload. Mackey testified that she was N.R.'s caseworker from June 2006 to January 2007. While she was N.R.'s caseworker, Mackey met with N.R. at least once a month and also spoke with N.R. by telephone at least six times each month.

Mackey testified about an incident in June or July 2006 where N.R. had made an accusation that her foster mother, R.H., had physically abused her and N.R. had run away from her foster home. According to Mackey, N.R. later told police and Mackey that she had made up the accusation because she wanted to get out of that foster home and live where there were horses.

Mackey testified that N.R. had made statements to her that she knew how to get what she wanted. Mackey further testified that other foster parents had reported that N.R. had bragged about being able to manipulate and lie to get her way. The State presented a July 2006 log from one of N.R.'s foster parents, which read in part: "[N.R.] bragged to the other girls she knows how to manipulate people. She told numerous lies to everyone in our

home and everyone was very upset with her. A few of us confronted her and told her how wrong she was."

Mackey further testified that in December 2006, N.R. had made an accusation that the 33-year-old boyfriend of her foster mother had tried to touch her. According to Mackey, N.R. later decided that she was not upset about the incident. Nevertheless, Mackey admitted that she had never personally discussed this incident with N.R. Mackey also stated that N.R. had been assigned a new life skills worker who was male, but that "it was staffed that we needed to move him off of it because we were scared of accusations being made against him." Mackey testified that N.R. was then moved to a female life skills worker.

Mackey further testified that N.R. comes across as being slow, but that N.R. was not mentally impaired. Nevertheless, on cross-examination, Mackey admitted that a psychological evaluation in N.R.'s case file showed that N.R.'s IQ was in the below average range and indicated mild mental retardation.

Mackey testified that her opinion was that N.R. made false accusations on several occasions. Nevertheless, on cross-examination, Mackey conceded that her opinion was not that N.R. was generally untruthful:

"[Prosecutor:] When asked about your opinion to her truthfulness, your answer was: She makes false accusations on several occasions. Not that she is generally untruthful, isn't that correct?
"[Mackey:] I guess."

Mackey admitted that she could identify only two specific occasions where N.R. had been untruthful and that both were after April 18, 2006. One of those occasions was when N.R. had run away from her foster home, and the other was from the July 2006 log from one of N.R.'s foster parents. Further, Mackey acknowledged that she was not a part of the community in which N.R. lived.

Pope testified that she had been N.R.'s caseworker from July 2005 to June 2006. According to Pope, she had not worked with Mackey on N.R.'s case. According to Pope, she had had a great opinion of N.R. up until she had a telephone conversation with

N.R.'s foster mother, R.H., in May 2006. Pope testified that R.H. had told her that N.R. was going to say that a boy N.R. went to prom with had raped her. R.H. told Pope, however, that N.R. changed her mind a couple of days later and said that she did not think the boy raped her. Pope testified that she had asked R.H. whether she thought N.R. was telling the truth and R.H. had responded that she did not know at that point.

R.H., who had been N.R.'s foster mother from February 2006 to July 21, 2006, testified that N.R. had never made any allegations towards her while N.R. lived with her.

At the conclusion of the proffer hearing, the trial court determined that the evidence was inadmissible at trial. The trial court noted that the two incidents referred to by Mackey had occurred after the alleged rape in this case and were very vague as to whether they constituted incidents of untruthfulness. The trial court further noted that it was unclear whether the incident concerning the potential rape at prom was an incident of lying as the social worker had not even talked to N.R. about it. The trial court determined that the testimony was vague and speculative, that it did not constitute reputation evidence, and that it was based on specific instances. Moreover, the trial court determined that the testimony was not reputation evidence from within the community.

### Reputation Evidence and Opinion Testimony

Penn contends that the trial court erred in not allowing him to present evidence of rumors, which constituted reputation evidence, at the hearing. Penn maintains that by limiting him "to presenting witnesses' testimony of N.R.'s veracity to simply their own personal information about her, *and not rumors that the case workers had heard,* the court improperly excluded evidence of N.R.'s reputation." (Emphasis added.)

To support his argument, Penn cites *State v. Hinton*, 206 Kan. 500, 479 P.2d 910 (1971). *Hinton*, however, has no application to the instant case as it involved cross-examination of character witnesses. In *Hinton*, our Supreme Court held:

"When the defendant in a criminal action produces witnesses who testify as to his good reputation for the relevant facet of character, they may be cross-examined

as to whether they have heard rumors in the community or neighborhood as to particular acts, conduct or charges prior to the offense presently asserted by the state which tend to negative such reputation." 206 Kan. 500, Syl. ¶ 1.

Thus, in a criminal action, the State is allowed to cross-examine the defendant's character witnesses about whether they have heard rumors in the community as to acts committed by the defendant before the charged offense. Our Supreme Court in *Hinton* made clear that this type of cross-examination about rumor evidence is not to establish the truth of such acts, but merely to test the credibility of the character witnesses. 206 Kan. 500, Syl. ¶ 2. Because they have testified to someone's reputation for truth and veracity, it is relevant to test their knowledge of that reputation.

The theory in *Hinton* was that "if he [the character witness] has heard such disparaging rumors his standards as to what constitutes good repute may not be sound, or he lacks good faith, or if he has not heard the rumors, which did in fact circulate, then he is not actually familiar with the defendant's reputation." 206 Kan. at 506. Penn cites no cases where the rule in *Hinton* has been extended to allow the presentation of rumor evidence to prove a trait of the complaining witness' character.

Distinguishing the rule under K.S.A. 60-422(d) prohibiting evidence of specific instances of conduct from the admissibility of rumor evidence when cross-examining a character witness, 3 Barbara, Kansas Law and Practice, Lawyer's Guide to Evidence § 3.2, p. 75 (5th ed. 2007), explains:

"The rule prohibiting instances of conduct to attack credibility is not applicable where the witness on direct examination placed in evidence [t]he trait for veracity of another, generally the defendant in a criminal case. The character witness may be cross-examined about instances of conduct of the principal witness probative of untruthfulness. The witness may be asked about familiarity with convictions, arrests, indictments, rumors or reports relating to the issue of untruthfulness. The purpose is not to establish the truth of the facts inquired about, but rather to show the existence of such acts as they may bear upon the credibility of the witness and the accuracy of his testimony regarding community opinion; thus, a character witness may be asked about rumors or whether he has heard that the defendant has been arrested for a crime whether or not it culminated in a conviction. *State v. Hinton*, 206 Kan. 500, 479 P.2d 910 (1971)."

Because the instant case did not involve the cross-examination of a character witness, the rule in *Hinton* has no application.

Moreover, even if the instant case involved cross-examination of a character witness as in *Hinton*, the rumors that Mackey and Pope had heard from other caseworkers and foster parents would not have been admissible based on the foundation requirements set forth in *Hinton*. Although Penn maintains that the trial court did not allow him to present rumor evidence at the proffer hearing, the record establishes otherwise. Both Mackey and Pope testified about specific instances of N.R.'s conduct about which they had no direct knowledge but had heard from other caseworkers and foster parents. Nevertheless, the record indicates that the specific instances occurred after April 18, 2006, the date that the alleged crimes occurred in this case. Under *Hinton*, the instances must have occurred before the alleged crimes: The witnesses may be cross-examined "as to whether they have heard rumors in the community or neighborhood as to particular acts, conduct or charges *prior to the offense presently asserted by the state* . . . ." (Emphasis added.) 206 Kan. 500, Syl. ¶ 1. Moreover, the examination must be conducted in the proper form, that is, "Have you heard," not "Do you know." 206 Kan. 500, Syl. ¶ 6.

Further, *Hinton* requires that when a character witness is cross-examined about rumor evidence, there must be no question as to the fact of the subject matter of the rumor, that is, of the previous pertinent misconduct. 206 Kan. 500, Syl. ¶¶ 5, 6. The cross-examining attorney must also have a very high degree of good faith. 206 Kan. at 507. In this case, however, Penn failed to establish that there was no question as to the fact of the subject matter of the rumors that Mackey and Pope had heard. Mackey and Pope admitted that they had never talked with N.R. about most of the alleged instances of misconduct. There was nothing offered to substantiate the rumors. Penn presented no other evidence to prove that N.R. had made false allegations before the alleged crimes occurred in this case. Even under *Hinton*, Penn failed to establish a sufficient foundation for the admissibility of rumor evidence.

Nevertheless, different from *Hinton*, Penn argued that he should be able to offer opinion and reputation evidence of N.R.'s character

trait of untruthfulness. In order for Penn to offer evidence to show N.R.'s reputation in the community, he needed to set an adequate foundation to show that the evidence was admissible. When a trait of a person's character at a specified time is material, evidence of the person's reputation in the community in which the person lives or in a group with which the person habitually associates is admissible to prove the truth of the person's reputation. K.S.A. 60-460(z). 3 Barbara, Kansas Law and Practice, Lawyer's Guide to Evidence § 3.2, p. 77, sets forth the foundation proof that must be established in order to present reputation evidence under K.S.A. 60-446:

"1. The impeaching witness is a member of the same community of the witness to be impeached and has been a resident thereof for a substantial period of time.
"2. He is aware of the general reputation of the witness for the specific character trait.
"3. He knows that the witness has a reputation for (dishonesty) in the community."

Penn also needed to establish a similar foundation in order for opinion testimony of N.R.'s untruthfulness to be admissible. Specifically, 3 Barbara, Kansas Law and Practice, Lawyer's Guide to Evidence § 3.2, p. 77, sets forth the foundation that must be established in order to present opinion testimony:

"1. The impeaching witness is acquainted with the witness and has known him for a period of time.
"2. He knows the witness well enough to have formed an opinion of the specific character trait of the witness for veracity.
"3. He has an opinion on this trait.
"4. He is of the opinion that the witness lacks veracity—that he would not believe the witness even under oath."

Here, Penn never established a proper foundation for the admission of opinion and reputation evidence from Mackey and Pope. Neither Mackey nor Pope were members of the community in which N.R. lived. Their contacts with N.R. were limited and constituted meeting with N.R. once a month and conversing with her by telephone at other times during the month. Moreover, they had only been N.R.'s caseworkers for a short period of time. Pope had been N.R.'s social worker for approximately 11 months.

Mackey had been N.R.'s social worker for only 7 months, and this was *after* the alleged rape had occurred.

Penn attempts to compare this case to *Lewis*, 252 Kan. 535. In *Lewis*, our Supreme Court held that the trial court erred in refusing to permit four defense witnesses to testify as to the reputation of the complaining witness as to veracity. All of the witnesses were acquaintances of the complaining witness, and one of the witnesses was the former boyfriend of the complaining witness. All of the witnesses would have testified that the complaining witness had a reputation for being a liar. The trial judge's ruling indicated that he excluded their testimony in part because of his disapproval of the lifestyles and socio-economic status of the witnesses, as expressed in their testimony. Nevertheless, our Supreme Court held that the witnesses' expressions should go to the weight of the testimony and had no bearing on the admissibility of the testimony. Moreover, our Supreme Court determined that the trial court erroneously applied the rape shield statute to exclude the witnesses' testimony. 252 Kan. at 537-39.

This case differs from *Lewis* in that the witnesses in *Lewis* were acquaintances, one even a former boyfriend of the complaining witness, who could offer testimony as to the complaining witness' general reputation for truthfulness. In this case, however, the social workers were not personally acquainted with N.R. in the community in which she lived and their contacts with her were limited to their role as caseworkers. As a result, Penn was unable to meet the foundation requirements for Mackey and Pope to express an opinion about N.R.'s general reputation in the community in which she lived for untruthfulness. Mackey's and Pope's proffered testimony showed that they had insufficient knowledge on which to base any opinions as to whether N.R. was generally an untruthful person.

Moreover, Penn failed to establish that either Mackey's or Pope's opinion was that N.R. was generally an untruthful person. Mackey admitted that her opinion was not that N.R. was generally untruthful. In addition, Pope admitted that her opinion of N.R. was great before the alleged crimes occurred and that her opinion changed only after learning of an incident in May 2006.

Arguably, general reputation evidence and opinion testimony could have been introduced through N.R.'s foster parents, as they were the ones who had daily contact with N.R. and had habitually associated with her. Moreover, most of Mackey's and Pope's testimony was based on what they had heard from the foster parents. As a result, the foster parents might have been the more appropriate witnesses for this type of evidence. Nevertheless, Penn offered testimony from only one of N.R.'s foster parents during the proffer hearing. That foster parent testified that N.R. had never made any allegations, false or otherwise, towards her while N.R. lived with her. Further, that foster parent failed to offer any opinion testimony or evidence as to N.R.'s reputation in the community in which she lived.

Throughout his appellate brief on this issue, Penn points to specific instances of N.R.'s misconduct. During the proffer hearing, Penn elicited testimony from both Mackey and Pope about specific instances of N.R.'s untruthfulness that had been reported by other social workers and N.R.'s foster parents. By highlighting the evidence of specific instances of conduct, Penn attempted to attack N.R.'s credibility through rumors and innuendos. This evidence of specific instances of conduct is inadmissible under K.S.A. 60-422(d). See *State v. Smallwood*, 223 Kan. 320, 327, 574 P.2d 1361 (1978) (two episodes concerning witness' testimony at preliminary hearing where witness had admitted to not telling the truth were specific instances of his conduct and were excluded by K.S.A. 60-422[d]). Moreover, the evidence was inadmissible under K.S.A. 60-447(a) because Penn never showed that the alleged misconduct resulted in a conviction. Specific instances that do not result in conviction may not be affirmatively proved. See *State v. Woods*, 222 Kan. 179, 187, 563 P.2d 1061 (1977); see also *State v. Deavers*, 252 Kan. 149, 156-57, 843 P.2d 695 (1992), *cert. denied* 508 U.S. 978 (1993) (Prior instances of excessive force by officer were inadmissible to prove character.).

At oral argument, the State pointed out that if this type of rumor evidence was admitted at trial, the trial would improperly turn into a series of "mini-trials" in order to establish whether the rumors were credible. As 4 Gard and Casad, Kansas Law and Practice,

Kansas C. Civ. Proc. Annot. § 60-422, pp. 512-13 (4th ed. 2003), explains:

"The reason for the restriction [of specific instances of conduct under K.S.A. 60-422(d)] is that where character is only incidentally involved, it would not be expedient to let the trial go off on collateral tangents, which could result from trying out the factual issues involved in the proof of specific instances of conduct. A Kansas case in point in *Tersina v. Liverpool & London & Globe Ins. Co.*, 102 Kan. 87, 169 Pac. 559 (1917), where witnesses were called to show that the plaintiff was guilty of prohibitory law violations 'and the real issues of the case were for a time lost sight of and the plaintiff was tried for a public offense.'"

Here, if Penn were allowed to introduce at trial the rumors that had been heard by Mackey and Pope, the State would need to ascertain whether those specific rumors were valid. A series of mini-trials would result in which the credibility of each specific rumor would be examined. This is exactly why the rule under K.S.A. 60-422(d) was designed to prohibit the introduction of specific instances of conduct into evidence.

The instant case is similar to *State v. Evans*, 90 Kan. 795, Syl. ¶ 1, 136 Pac. 270 (1913), where our Supreme Court held that a witness was not competent to state what the complaining witness' general reputation for truthfulness was. The witness was Reverend Barnhart, who worked for a church society organized for the purpose of finding homes for children. Barnhart had been given charge of the complaining witness by the probate court soon after the complaint in the case had been filed. Barnhart placed the complaining witness at a home in Douglas County and then at a hotel in Lawrence until the state board of control took charge of her. The complaining witness was then placed in two homes in Lawrence and was later given to the charge of the Children's Home Society of Topeka. Barnhart was asked if he knew the complaining witness' general reputation in Lawrence for truth and veracity. Barnhart answered that he knew only from the families with whom he had placed her and that he had no knowledge of her general reputation among the neighbors of the people with whom she lived. Based on his response, the trial court did not allow Barnhart to testify at trial about the witness' general reputation for truthfulness.

On appeal, our Supreme Court noted that the excluded testimony, which sought to impeach the veracity of the complaining witness, was of considerable importance to the defendant because the testimony of the only corroborating witness at trial was somewhat weak and contradictory. Nevertheless, our Supreme Court held that there was no error in excluding the evidence: "The rule has always been that the inquiry must relate to the general character and not to specific acts, and can be shown only by general reputation in the community where the person lives. [Citation omitted.]" 90 Kan. at 797.

The testifying witness in *Evans* was acting in a similar capacity as the social workers in this case: managing the care of the complaining witness. Here, as in *Evans*, the social workers' testimony was not based on their personal observations of N.R. in the community where she lived. Similar to the excluded testimony in *Evans*, the majority of the social workers' testimony was based on information they had heard from the families with whom they had placed N.R. Such evidence was inadmissible and, as demonstrated by *Evans*, could not form the basis of the social workers' testimony regarding their opinions of N.R.'s general reputation for untruthfulness in the community in which she lived.

3 Barbara, Kansas Law and Practice, Lawyer's Guide to Evidence § 3.2, pp. 77-78, offers the following illustration concerning the presentation of opinion and reputation evidence as to a witness' character trait for veracity:

"Q. Are you acquainted with Mr. Brown?

"A. Yes.

"Q. How long have you known him?

"A. Oh, about 20 years. We live in the same neighborhood..

"Q. Do you know whether Mr. Brown has a general reputation in the community for truthfulness or untruthfulness?

"A. Yes, I do.

"Q. Can you tell us what that reputation is?

"A. It's bad. He is known generally as an untruthful person.

"Q. Now, have you had personal experiences with Mr. Brown?

"A. I sure have. We work together at the factory.

"Q. And from your contacts with him have you formed an opinion as to his character trait for truthfulness or untruthfulness?

"A. Yes.

"Q. Can you tell us what your opinion is?

"A. He's an untruthful person.

"Q. Now, can you tell us any specific instances of his untruthfulness?

"A. Yes, I sure can.

"Objection is made to the last question and answer on the basis of improper manner of showing character trait. The objection should be sustained."

Explaining why the last question of the above illustration was improper, 3 Barbara, Kansas Law and Practice, Lawyer's Guide to Evidence § 3.2, p. 78, states:

"When character trait is a disputed issue three kinds of evidence may be presented—evidence of reputation, opinion evidence and evidence of specific instances of conduct. The latter is not admissible if the character trait tends to prove a bad trait unless it was a conviction of a crime. [See K.S.A. 60-446 and K.S.A. 60-447(a).] Thus only the first two methods of reputation and opinion are proper. *State v. White*, 1 Kan. App. 2d 452, 571 P.2d 6 (1977)."

As the illustration shows, Mackey's and Pope's testimony referring to specific instances of N.R.'s conduct was inadmissible at trial. Penn's proffer of evidence relating to N.R.'s allegations against R.H., against her foster mother's boyfriend, and against N.R.'s prom date; relating to reports from foster parents that N.R. would lie and manipulate people; and relating to the action of reassigning N.R. to a female life skills worker were all specific instances of conduct that could not be admitted at trial to establish N.R.'s character traits for honesty and veracity under K.S.A. 60-422(d). See *State v. Aldrich*, 232 Kan 783, 783-84, 658 P.2d 1027, *cert. denied* 464 U.S. 819 (1983) (holding that evidence that prosecution witness had once sworn to false affidavit in order to receive welfare benefits for her children was inadmissible as specific instance of conduct under K.S.A. 60-422[d]).

The only evidence that would have been admissible in this case, if a proper foundation had been established, would have been testimony about N.R.'s general reputation in the community in which she lives and opinion evidence as to N.R.'s character trait for truthfulness or untruthfulness. Nevertheless, as discussed previously, Penn never established a sufficient foundation to show that Mackey and Pope were qualified to offer general reputation or opinion testimony about N.R.'s untruthfulness. Based on the facts pre-

sented to the trial court, the testimony of Mackey and Pope did not constitute opinion and reputation evidence that was admissible under K.S.A. 60-446. Accordingly, the trial court properly excluded their testimony at trial.

## II. Was there prosecutorial misconduct?

Next, Penn contends that the prosecutor's questioning of Penn during cross-examination about Penn's postarrest statements, which violated an order in limine, constituted prosecutorial misconduct. The record demonstrates that Penn failed to object at trial to the alleged prosecutorial misconduct. Nevertheless, a contemporaneous objection to alleged prosecutorial misconduct is not required in order to preserve the issue for appeal; an appellate court will apply the same standard of review regardless of whether the defendant lodged an objection. *State v. Albright*, 283 Kan. 418, 428, 153 P.3d 497 (2007).

In *State v. Gleason*, 277 Kan. 624, 640, 88 P.3d 218 (2004), our Supreme Court set forth the general standard of review regarding purported violations of orders in limine:

" 'While it is true that an order in limine excludes evidence that, if admitted, would tend to prejudice the jury, it is not true that a violation of the order always results in prejudice that cannot be cured. We employ a two-part test to evaluate alleged violations of a motion in limine: (1) Was there a violation of the order in limine and (2) if the order in limine is violated, did the testimony substantially prejudice the defendant? The burden is on the defendant to show substantial prejudice.' [Citations omitted.]"

Thus, the first step is to determine whether there was a violation of the order in limine. In the middle of trial, the trial court held a *Jackson v. Denno* hearing to determine whether statements made by Penn after his arrest were admissible. See *Jackson v. Denno*, 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774 (1964). The arresting officer testified that after he took Penn into custody and told him that he was under arrest for assault, Penn asked, "What is an assault?" and then "Is that like hitting someone?" The trial court ruled that Penn's questions were inadmissible at trial.

Nevertheless, during the prosecutor's cross-examination of Penn, she elicited testimony that Penn had asked those questions.

Specifically, the following colloquy took place during Penn's cross-examination:

"[Prosecutor:] It's true that you knew that you were being arrested for some type of assault; isn't that correct?
"[Penn:] Not when I was getting arrested, ma'am.
"[Prosecutor:] Isn't it true, Mr. Penn, that after the officer put handcuffs on you, and he placed you in his police car, you asked him, *What's an assault, isn't that like hitting someone.*
"[Penn:] *Yes, that was after he had told me I was a suspect in an assault case.*
"[Prosecutor:] So you just had sex with this girl who has never had sex before off campus, and your question is, Isn't that like hitting someone?
"[Penn:] After he asked me, after he told me I was a suspect in an assault case. I was nervous.
"[Prosecutor:] They think you've assaulted someone when you've really raped someone.
"[Penn:] No, ma'am. No, ma'm [*sic*].
"[Prosecutor:] You were thinking, this is going to go well for me?
"[Penn:] No, ma'am. No, ma'am." (Emphasis added.)

In this portion of the prosecutor's cross-examination of Penn, the prosecutor violated the trial court's order in limine by eliciting testimony about Penn's questions to the officers after he was arrested.

The State maintains that the prosecutor's questions were proper because Penn had opened the door to this type of questioning by his testimony on direct examination. It is well established that "when a defendant opens an otherwise inadmissible area of evidence during the examination of witnesses, the prosecution may then present evidence in that formerly forbidden sphere. [Citations omitted.]" *State v. Johnson*, 258 Kan. 475, 481, 905 P.2d 94 (1995).

In arguing that Penn opened the door to the admission of the evidence in question, the State points to Penn's testimony on direct examination about the circumstances of his arrest:

"[Penn:] We were walking out the complex, and we were going to her car. And I seen a lot of police cars around. They were looking for something or somebody, or something. That's what I'm thinking.
"I was thinking, Who did something? And a police car passed me, and stopped and reversed real fast, and two police officers jumped out.
"One police officer hopped out—that one (indicating). And one came immediately behind it.
"[Defense counsel:] What was your reaction when they approached you?

"[Penn:] Soon as they got out of the car, they asked me, [W]as I Tyler. And I said, Yes.

"And they pulled the taser out. And it was—I heard you defecate yourself if you get tased. I was—I didn't know what was going on. I just put my hands straight up and I froze.

"They handcuffed me and put me in the back of the car."

The State maintains that in light of Penn's self-serving testimony about his arrest, the prosecutor was justified in questioning Penn's assertion that he was completely caught off-guard when he was arrested. Nevertheless, Penn's testimony about his arrest related to his thoughts and actions leading up to his arrest. Although defense counsel attempted to ask Penn what his reaction was when he found out why he was being arrested, the prosecutor objected to the question as irrelevant. Because the prosecutor's objection was sustained, Penn never answered the question. Penn never testified about his thoughts or actions after the officers told him the reason for his arrest. As a result, Penn did not open the door to the prosecutor's cross-examination questions, and the trial court's order in limine was violated.

The next step is to determine whether the testimony substantially prejudiced Penn. Our Supreme Court in *Gleason* stated that when a violation of an order in limine is based upon a defendant's allegation of prosecutorial misconduct, the analysis includes the following additional factors:

" 'In order for prosecutorial misconduct to constitute reversible error, the error must be of such magnitude as to deny a defendant his constitutional right to a fair trial. [Citation omitted.] Three factors should be considered in determining whether to grant a new trial because of a prosecutor's violation of an order in limine. First, was the prosecutor's misconduct so gross and flagrant as to prejudice the jury against the defendant? Second, does the admission of the statement indicate ill will by the prosecutor? Third, is the evidence against the defendant so overwhelming that there was little or no likelihood the prosecutor's violation of the order in limine changed the result of the trial?' [Citations omitted.]" 277 Kan. at 641.

The three factors outlined above are consistent with the factors that an appellate court considers when deciding other allegations of prosecutorial misconduct. See *Albright*, 283 Kan. at 428. Since *Gleason*, however, our Supreme Court decided *State v. Tosh*, 278

Kan. 83, 91 P.3d 1204 (2004), where it added another layer to the analysis of whether the misconduct prejudiced the defendant. In *Tosh*, our Supreme Court held that before the third factor (overwhelming evidence) can ever override the first two factors, an appellate court must be able to say that the harmless error tests of both K.S.A. 60-261 (refusal to grant new trial is inconsistent with substantial justice) and *Chapman v. California*, 386 U.S. 18, 22, 17 L. Ed. 2d 705, 87 S. Ct. 824, *reh. denied* 386 U.S. 987 (1967) (conclusion beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial), have been met. 278 Kan. 83, Syl. ¶ 2.

As to the first factor, gross and flagrant misconduct, we note that the testimony elicited by the prosecutor was a direct violation of the trial court's order in limine. Although the State argues that Penn had opened the door to this type of testimony, the prosecutor never sought a ruling by the trial court on this issue before she elicited the testimony from Penn. Moreover, as discussed previously, a review of the transcript demonstrates that Penn did not open the door to this inadmissible evidence. Further, once the prosecutor got Penn to admit that he asked, "What's an assault, isn't that like hitting someone[?]"; the prosecutor then tried to elicit further testimony from Penn that he had thought he was getting off easy for the incident with N.R. As a result, it appears that the prosecutor's misconduct in cross-examining Penn on the questions he asked after his arrest was gross and flagrant.

As to the second factor, prosecutorial ill will, we note that the prosecutor's questioning of Penn about his reaction to the reason for his arrest was very brief during the 3-day trial. The testimony occupied only 1 page of a transcript spanning over 450 pages. Moreover, the prosecutor did not elicit testimony from the arresting officers about Penn's questions, and she did not refer to Penn's testimony concerning the questions in her closing arguments. As a result, the record fails to show that there was prosecutorial ill will.

As for the third factor, whether there was little, if any, likelihood that the violation of the order in limine changed the result of the trial, we observe that the evidence against Penn was overwhelming. The evidence was undisputed that Penn had engaged in sexual

intercourse with N.R. N.R. had consistently described Penn as using forceful actions against her during the incident in question. She had consistently described the pain that she had experienced during the sexual acts. The sexual assault examination corroborated her testimony about the events and showed significant physical injury to her, including blunt force trauma to her vagina, hymen, and cervix. Under the facts of the case, we conclude beyond a reasonable doubt that the prosecutor's violation of the order in limine had little, if any, likelihood of having changed the result of the trial. In addition, based on our review of the entire transcript of this case, the refusal to grant Penn a new trial was not inconsistent with substantial justice. As a result, we are unable to grant relief to Penn on his prosecutorial misconduct claim.

### III. Did the trial court err in assessing attorney fees?

Next, Penn contends that the trial court erred in assessing attorney fees against him by failing to take into account his financial resources or the burden those fees would impose on him. The State concedes that this case needs to be remanded for further proceedings under *State v. Robinson*, 281 Kan. 538, 132 P.3d 934 (2006). In *Robinson*, our Supreme Court held: "A sentencing court assessing fees to reimburse the Board of Indigents' Defense Services under K.S.A. 2005 Supp. 22-4513 must consider on the record at the time of assessment the financial resources of the defendant and the nature of the burden that payment of the fees will impose." 281 Kan. 538, Syl. ¶ 1. Here, the appellate record fails to demonstrate that the procedure outlined in *Robinson* was followed. As a result, under *Robinson*, this case should be remanded with directions for the trial court to comply with K.S.A. 22-4513 concerning the assessment of attorney fees.

### IV. Did the trial court err in using Penn's criminal history to increase his criminal history score?

Finally, Penn argues that the trial court erred in using his criminal history, which was not proved to a jury beyond a reasonable doubt, to increase his sentence. Penn concedes that this issue is controlled by our Supreme Court's decision in *State v. Ivory*, 273

Kan. 44, 41 P.3d 781 (2002). This court is duty bound to follow Kansas Supreme Court precedent, absent some indication the court is departing from its previous position. *State v. Singleton*, 33 Kan. App. 2d 478, 488, 104 P.3d 424 (2005). Because our Supreme Court has consistently followed its position in *Ivory*, we are unable to grant relief to Penn on this issue. See *State v. Brinklow*, 288 Kan. 39, Syl. ¶ 10, 200 P.3d 1225 (2009).

Accordingly, we affirm Penn's convictions, vacate the portion of his sentences assessing attorney fees, and remand the case to the trial court with directions to comply with *Robinson* and K.S.A. 22-4513 concerning the assessment of attorney fees.