(242 P.3d 203)

No. 101,846

STATE OF KANSAS, *Appellee*, v. JAMES CHARLIE MCMILLAN, II, *Appellant*.

 Opinion filed November 12, 2010. 

*Matthew J. Edge*, of Kansas Appellate Defender Office, for appellant.

*Keith D. Hoffman*, county attorney, *Daryl E. Hawkins*, assistant county attorney, and *Steve Six*, attorney general, for appellee.

Before MALONE, P.J., CAPLINGER and LEBEN, JJ.

LEBEN, J.: James McMillan's neighbor, Milton Jamison, was found in Jamison's mobile home, lying in a pool of blood with 56 knife wounds all over his body. Jamison and McMillan had played dominoes and drunk whiskey at Jamison's home the night before. McMillan told the police that he went home that night and had returned in the morning to find Jamison dead. McMillan had testified that he checked Jamison's body for vital signs, but McMillan was covered with more blood than would be transferred through the casual contact of checking vitals. He also had a bloody pocketknife in his pants, which the coroner concluded could have caused the wounds. A search warrant executed in McMillan's home later that day found items that tested positive for marijuana in a locked box under McMillan's bed. A jury convicted McMillan of intentional second-degree murder, possession of drug paraphernalia, and possession of marijuana. McMillan claims on appeal that the State committed prosecutorial misconduct and that the district court committed reversible error in six ways through his trial and at sentencing.

We will discuss McMillan's claims in detail but will first summarize our rulings. After review of the arguments and the trial transcript, we have concluded that the State did not commit prosecutorial misconduct when the prosecutor referenced the Virginia Tech, Columbine, and Kennedy shootings. He did so as examples to show that the State didn't need to prove motive, not to inflame the jury. And although the prosecutor's discussion of the reasonable-doubt standard was improper, it was not prejudicial.

Additionally, four of McMillan's remaining allegations were not error: the proffered hearsay testimony of two would-be defense witnesses did not meet the declarations-against-interest exception to the general rule that hearsay is inadmissible; McMillan explicitly rejected a voluntary-intoxication instruction at trial, and such an instruction would have been inconsistent with his defense that he didn't commit the crime or did so while angry; the use of McMillan's criminal-history score to calculate his sentence was constitutional; and the imposition of the aggravated sentence was also constitutional.

The district court did err when it did not include a nonexclusive-possession instruction and told the jury that the Zig Zag rolling papers were drug paraphernalia. But no real possibility existed that the jurors would have found McMillan not guilty of these offenses had they been properly instructed. Because McMillan was not prejudiced by the district court's errors, we will not set aside the jury's verdict, which was reached after presentation of evidence and the jury's careful deliberation.

## FACTUAL BACKGROUND

On the morning of July 1, 2007, McMillan told police he had found his neighbor, Jamison, dead on the floor of Jamison's mobile home. The body was lying in large pool of blood. McMillan reported the incident to police as a possible suicide.

Questioned by the police, McMillan admitted that he and Jamison had played dominoes and drunk whiskey together at Jamison's house the night before. McMillan said that he went home around 11:30 p.m. and returned to check on Jamison the next morning because Jamison had been complaining of pains in his

side. While talking with McMillan, the police noticed that McMillan had a lot of blood on the jeans, shirt, and baseball cap he was wearing. McMillan said that he got the blood on him when he checked to see if Jamison was alive.

The police took McMillan back to the station. Once there, they seized a bloody folding knife from McMillan's pocket. The autopsy report indicated that Jamison had died from loss of blood after he'd been stabbed or cut 56 times. Additionally, the Kansas Bureau of Investigation concluded that the stains on McMillan's clothes were most likely "expired blood," meaning that the blood had to have left Jamison's body while he was still alive. The blood on McMillan's clothes and knife matched Jamison's DNA.

Later that day, police searched McMillan's home. They found a locked box containing marijuana and other drug paraphernalia under McMillan's bed. The paraphernalia included a pipe, a tin container, and Zig Zag rolling papers. The police also reviewed a call that McMillan made from jail to one of his roommates, Patty Senart, in which the two discussed the drug charges against McMillan. McMillan and Patty shared the same room in the trailer but had separate beds. McMillan told Patty that he had lost the key to the locked box and said that Mark Senart, another one of his roommates and Patty's brother-in-law, might have another key.

The State charged McMillan with one count of intentional second-degree murder, one count of misdemeanor possession of marijuana, and one count of misdemeanor possession of drug paraphernalia. The complaint was amended to add an alternative count of unintentional second-degree murder, which was later dismissed by the State at trial. At trial, McMillan presented evidence intended to show that he didn't kill Jamison and that someone else did. McMillan continued to deny any involvement in Jamison's death at sentencing.

A jury convicted McMillan of intentional second-degree murder and the two drug charges. Based on McMillan's criminal history of G, he was sentenced to the aggravated 203-month prison sentence for intentional second-degree murder and given 12 months in county jail for each of the misdemeanor drug charges; the sen-

tences were ordered to run consecutively, making the controlling sentence 227 months.

ANALYSIS

McMillan makes several arguments on appeal. We will discuss each of them separately.

1. *The State Did Not Commit Prosecutorial Misconduct When It Referenced the Virginia Tech, Columbine, and Kennedy Assassination Incidents, and the Prosecutor's Comment on the Reasonable-Doubt Standard Was Improper, Though Not Prejudicial.*

McMillan argues that the State committed misconduct twice during its closing argument. McMillan's attorney did not object at trial, but Kansas appellate courts will consider potential error based on prosecutorial misconduct in closing argument even without an objection during trial. *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009).

We review prosecutorial misconduct allegations in two steps: we first determine whether there was misconduct and, if there was, we then determine whether the misconduct amounts to plain error so that reversal is required. 288 Kan. at 351. As to the first step, such misconduct occurs when the comments are outside the wide latitude prosecutors are given when arguing cases. *State v. McReynolds*, 288 Kan. 318, 323, 202 P.3d 658 (2009). Prosecutors cannot comment on facts not in the evidence or give a personal opinion about the defendant's or other witnesses' credibility. *King*, 288 Kan. at 351-52. But they can craft arguments that are reasonable inferences from the evidence. 288 Kan. at 351. Second, prosecutorial misconduct constitutes plain error when it prejudices the jury against the defendant. *McReynolds*, 288 Kan. at 323. This court considers three factors in deciding whether the remarks were prejudicial: " '(1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence [was so direct and overwhelming] that the misconduct would likely have had little weight in [the jurors'] minds.' " 288 Kan. at 323. No one factor is individually controlling, and the third factor cannot override the first two unless

the error was harmless, meaning it had little likelihood of changing the jury's verdict. 288 Kan. at 323; *State v. Tosh*, 278 Kan. 83, 96, 91 P.3d 1204 (2004).

In this case, McMillan's allegations do not amount to prejudicial misconduct warranting reversal.

### A. *Comparison to the Virginia Tech Massacre, Columbine Shooting, and Kennedy Assassination*

McMillan first complains that the State improperly compared his case to the Virginia Tech massacre, the Columbine shooting, and the assassination of President Kennedy. But the prosecutor's comparison of the four cases was limited to the point that even though motives of killings could be unclear, we could still be confident about who had killed whom:

"There are crimes that we will never know why. Look at the Columbine shooting in Colorado. We don't know why that happened. Look at the Virginia Tech massacre on the college campus. We don't know why that happened. We don't know why Lee Harvey Oswald shot President Kennedy, but we know those incidents happened. We know who did it. And we know how it was done. And in this case we have presented that information to you."

McMillan insists that the comments inflamed the jury because they analogized his case to large-scale tragedies and constituted unsworn testimony about those other events. He also argues that the prosecution's mention of a lack of motive undermined its proof that he intended to commit the crime. The State replies that it was merely commenting on the fact that it didn't need to prove motive.

It is improper for the prosecutor to make statements intended to inflame the jury's passions or prejudices or to divert the jury from deciding the case on the evidence and controlling law. *Tosh*, 278 Kan. at 90. Inflammatory comments can include those that compare the case or the defendant to a high-profile crime or the person who committed it. See *DeFreitas v. State*, 701 So. 2d 593, 601 (Fla. Dist. App. 1997) (improper to compare the defendant's facts to specific facts in the O.J. Simpson case); *State v. Bailey*, 677 N.W.2d 380, 404 (Minn. 2004) (improper to suggest that the government had put the defendant's DNA on incriminating evidence like it had done in the O.J. Simpson case); *State v. Taylor*, 650

N.W.2d 190, 208 (Minn. 2002) (improper for the prosecutor to comment that the defendant killed his victim " 'like O.J.' " Simpson); *State v. Thompson*, 578 N.W.2d 734, 743 (Minn. 1998) (improper to refer to the O.J. Simpson verdict and to suggest that the defendant was going to "get off like O.J." and referring to the Simpson verdict served no purpose but to inflame jury and was therefore improper); *People v. Mendoza*, 2001 WL 1198937, at *4 (Mich. App. 2001) (unpublished opinion) (improper to compare the defendant's case to the Columbine shooting that occurred the day before trial).

Nonetheless, it is not misconduct for the prosecutor to use examples from common experience or history for explanation or contextual purposes. See *People v. Salazar*, 2010 WL 445497, at *9-10 (Cal. App. 2010) (unpublished opinion) (not improper to reference the Columbine and Virginia Tech incidents to show that a person intending suicide could also intend homicide); *People v. Perez*, 2008 WL 3330991, at *9-10 (Cal. App. 2008) (unpublished opinion) (not misconduct for the prosecutor to reference the Virginia Tech massacre to explain what it means for a person to "lose it" because the prosecutor did not set forth details of the massacre and did not argue that the defendant was like the shooter); *People v. Bailey*, 2009 WL 3323252, at *4 (Mich. App. 2009) (unpublished opinion) (not improper for the prosecutor to use Ted Bundy as an example to make her point that guilt cannot be judged solely on the defendant's appearance); *People v. Fitzpatrick*, 2003 WL 21977224, at *7-8 (Mich. App. 2003) (unpublished opinion) (not misconduct for the prosecutor to compare the case's facts to Communists killing American soldiers because the comments were related to the intent element of assault with the intent to commit murder charge, not solely to inflame the jury or to invite the jury to convict based on prejudice); *State v. Schaub*, 2005 WL 1531302, at *4 (Ohio App. 2005) (unpublished opinion) (not misconduct for prosecutor to reference the Holocaust in closing argument because the prosecutor was not equating the defendant's conduct with the Holocaust's magnitude or comparing the defendant with the one responsible for the Holocaust); *State v. Berger*, 1998 WL 329590, at *2-3 (Wash. App. 1998) (unpublished opinion) (not misconduct

for the prosecutor to reference O.J. Simpson because the prosecutor was not comparing the defendant to Simpson but was placing the case in temporal context by using examples that the jury likely knew); accord *People v. Williamson*, 172 Cal. App. 3d 737, 750, 218 Cal. Rptr. 550 (1985) (not improper for prosecutor to argue matters of common knowledge or to use illustrations from common experience, history, or literature); *State v. Lal*, 1997 WL 407869, at *5 (Wash. App. 1997) (unpublished opinion).

In this case, the State's comments did not compare McMillan to the shooters in those incidents or contend that the murder here was as horrific as those incidents. The comments were intended as examples of incidents with unclear motives that the jury was likely familiar with. The State's purpose in using those statements is clear because it surrounded them with a discussion of motive: "In this case the State doesn't know why this happened. . . . But that's not our burden. . . . Nowhere in [the jury] instructions does it say the State has to prove the motive."

Nor do the comments constitute unsworn testimony. Unsworn testimony usually takes the form of the prosecutor's personal opinions about the credibility of witnesses or evidence or the prosecutor's arguments about facts not in evidence. See, *e.g.*, *State v. Magallanez*, 290 Kan. 906, 914, 235 P.3d 460 (2010); *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 (2000); *State v. Gray*, 2009 WL 398837, at *5 (Kan. App.) (unpublished opinion), *rev. denied* 289 Kan. 1282 (2009). Although the referenced incidents aren't part of the evidence in this case, the prosecutor used them merely as examples and did not assume the role of an unsworn witness to those events, which are common knowledge. Moreover, as the State points out, the defense counsel expanded on the prosecution's Lee Harvey Oswald example in support of McMillan's defense by asserting that speculation still exists about whether Oswald did kill Kennedy.

Finally, the comments do not undermine the State's burden to show intent. Motive and intent are not identical, and the State properly told the jury that motive was not an element of the crime. See *State v. Carapezza*, 286 Kan. 992, 999, 191 P.3d 256 (2008). Moreover, the jury was given an instruction that second-degree

murder required proof that the defendant intended to kill the victim, and that instruction also defined intent. Thus, the prosecutor's comments were not improper and did not constitute misconduct.

### B. *Burden of Proof*

McMillan also objected to the prosecutor's explanation of reasonable doubt. After noting that the State had the burden of proof, the prosecutor in part asked jurors to consider what they felt in their hearts about the defendant's guilt:

> "And, basically, what it comes down to is, if you, in your hearts and in your minds, after hearing all the evidence and taking all the evidence into consideration, you feel in your hearts and in your minds that the State had proven each and every element of the crime charged, you have reached that reasonable doubt standard and you must find the defendant guilty."

McMillan contends that this statement reduced the State's burden of proof and essentially told the jury to apply a completely subjective and improper definition of reasonable doubt.

The State responds that this statement did not reduce its burden; rather, the prosecution merely explained to the jury that the State had proved McMillan guilty if it had met its burden on every element of the crime. The State notes that it had mentioned its burden right before the objected-to statements.

The prosecution acts improperly when it misstates the law by incorrectly defining its burden to prove the defendant guilty beyond a reasonable doubt. *Magallanez*, 290 Kan. 914-15. Kansas courts have repeatedly admonished prosecutors about explaining the reasonable-doubt standard in their own words since reasonable doubt is best defined by the words themselves. See *State v. Brinklow*, 288 Kan. 39, Syl. ¶ 5, 200 P.3d 1225 (2009); *State v. Sappington*, 285 Kan. 176, 185-86, 169 P.3d 1107 (2007); *State v. Wilson*, 281 Kan. 277, 287, 130 P.3d 48 (2006); *State v. Banks*, 260 Kan. 918, 928, 927 P.2d 456 (1996); *State v. Bridges*, 29 Kan. 138, 141 (1882); *State v. Jackson*, 37 Kan. App. 2d 744, 747, 157 P.3d 660, *rev. denied* 285 Kan. 1176 (2007). Even trial courts are encouraged not to give more expansive definitions of the term when requested to by the jury. *State v. Walker*, 276 Kan. 939, 956, 80 P.3d 1132 (2003).

When prosecutors have dared to define the term, there have been somewhat mixed results as to whether a prosecutor's statements were improper. For example, it wasn't misconduct when the prosecution referred the jury to the definition of reasonable doubt and told the jury that it would know it when it saw it or that it must decide the definition. *Wilson*, 281 Kan. at 286; *State v. Milligan*, 2010 WL 3488660, at *4 (Kan. App. 2010) (unpublished opinion). Yet it was held improper to tell the jury that the burden is a "common sense" burden, that the defendant was no longer presumed innocent, or that jurors should vote guilty if they were reasonably sure of the defendant's guilt. See *State v. Decker*, 288 Kan. 306, 315-16, 202 P.3d 669 (2009); *State v. Mitchell*, 269 Kan. 349, 361, 7 P.3d 1135 (2000); *Jackson*, 37 Kan. App. 2d at 747-49.

Most pertinent to this case are those cases in which it was held improper for the prosecution to tell the jury to convict if it merely knew or believed that the defendant was guilty. *Magallanez*, 290 Kan. at 914 (improper to tell the jury that reasonable doubt is " 'a standard that when you believe he's guilty you've passed beyond' " a reasonable doubt); *Brinklow*, 288 Kan. at 49-50 (improper to tell the jury that "sometimes you just know" that the defendant is guilty). Here, the State did just that: it told the jury members to "feel in your hearts and in your minds" whether the State had shown that McMillan was guilty. It is improper to ask jurors to decide whether reasonable doubt exists based upon feelings in their heart or gut. See *Randolph v. State*, 117 Nev. 970, 979, 981-82, 36 P.3d 424 (2001) (prosecutor's statement that there's no reasonable doubt when a juror has " 'a gut feeling he's guilty' " held improper); *Wesley v. State*, 112 Nev. 503, 514, 916 P.2d 793 (1996) (prosecutor's statement that if you " 'feel it in your stomach and if you feel it in your heart . . . then you don't have reasonable doubt' " was improper).

We recognize that reasonable doubt is an important issue in most criminal trials and that both prosecutors and defense lawyers often begin to address this concept during jury selection. We also recognize that both prosecutors and defense lawyers naturally want to make some comment about the issue in closing argument. But our Supreme Court has long ago provided guidance to prosecutors

about what can't be said. Given the importance of this issue in most criminal trials, a prosecutor should be able to prepare remarks on this topic that can be given without violating these admonitions. It is outside the prosecutor's wide latitude to ask jurors to look at anything other than the evidence when determining someone's guilt, and it is improper to ask jurors to consider what they feel in their heart when determining whether the State has met its burden of proof.

## C. *Prejudice*

Even though the prosecution's reasonable-doubt explanation was improper, the statement didn't prejudice McMillan.

First, the statement didn't rise to the level of what Kansas courts have found to be "gross and flagrant." See *State v. Kemble*, 291 Kan. 109, 123, 238 P.3d 251 (2010) (gross and flagrant to comment on criminal defendant's refusal to testify at trial); *State v. Penn*, 41 Kan. App. 2d 251, 277, 201 P.3d 752, *rev. denied* 289 Kan. 1284 (2009) (gross and flagrant to elicit testimony that was a direct violation of the district court's order in limine); *State v. Herrera*, 41 Kan. App. 2d 215, 227-28, 202 P.3d 68 (2009) (gross and flagrant to intentionally attempt to taint the trial process with improper legal arguments); *State v. Bunyard*, 281 Kan. 392, 407, 133 P.3d 14 (2006) (same); *State v. Blomquist*, 39 Kan. App. 2d 101, 111, 178 P.3d 42 (2008) (gross and flagrant to repeatedly refer to the defendant's homosexuality in prosecution for indecent liberties with a minor); *State v. DuMars*, 33 Kan. App. 2d 735, 746, 108 P.3d 448, *rev. denied* 280 Kan. 986 (2005) (gross and flagrant to deliberately frame question to elicit an inadmissible hearsay response); *State v. Magdaleno*, 28 Kan. App. 2d 429, 437, 17 P.3d 974, *rev. denied* 271 Kan. 1040 (2001) (gross and flagrant to call opposing counsel a liar).

Second, with respect to ill will, the prosecutor did comment on the reasonable-doubt definition against the urgings of both the Kansas Supreme Court and this court. See *State v. Elnicki*, 279 Kan. 47, 66, 105 P.3d 1222 (2005) (failure of prosecutor to heed the court's warnings not to comment on witness credibility showed ill will). But the prosecution didn't mock the defendant or repeat-

edly ask the jury to "feel in its hearts and minds" that the defendant was guilty. See *Brinklow*, 288 Kan. at 50 (repetition of " 'sometimes you just know' " showed ill will); *Herrera*, 41 Kan. App. 2d at 228 (ill will includes mocking the defendant or repeated acts of misconduct). In fact, the prosecutor's comments also referred to a proper definition of reasonable doubt and placed the misstatement of the law in a context that otherwise was within the bounds of permissible argument:

"I want to comment briefly on the reasonable doubt statute. The State filed this case. The State has to prove the case. You know, that's the law, and that's fair. We have to prove the case such that there is no reasonable doubt as to the truth of the elements that we've alleged.

"Now, the Court has given you the instructions on the elements of each charge, and we'll get into those later on. But that's the burden the State has.

"A lot of people have a misconception that we have to prove it—a case beyond any and all doubt. Beyond a shadow of a doubt. That is not our burden, ladies and gentlemen. The fact is and the law is, you can have a doubt as to the claim or a claim made by the State of Kansas. But if that doubt is not reasonable, then, based upon the evidence, you must find the defendant guilty.

"And there's no percentage on this. It's not set forth in the law. It's not saying, well, you got to reach 51 percent, or you got to reach this percent or that percent. There's no such thing.

"And, basically, what it comes down to is, if you, in your hearts and in your minds, after hearing all the evidence and taking all the evidence into consideration, you feel in your hearts and in your minds that the State has proven each and every element of the crime charged, you have reached that reasonable doubt standard and you must find the defendant guilty.

"And we feel comfortable, based upon the evidence that you heard from the—from the witness stand and the physical evidence that was introduced into evidence that you're going to find the defendant guilty beyond a reasonable doubt in this case."

The prosecutor framed his misstatement within a discussion of the proper standard, and the court's jury instruction included a proper definition of reasonable doubt. These are significant factors supporting a finding of no ill will. See *Decker*, 288 Kan. at 315-16 (although the prosecution's statement was improper, the error was not prejudicial because the prosecutor's other statements properly argued that the State had overcome the presumption of innocence); *Jackson*, 37 Kan. App. 2d at 751 (no ill will because the misstatement happened only once and the prosecutor referred the

jury to the proper reasonable-doubt standard). We thus find that the prosecutor's misstatement was not the result of ill will or bad faith.

Third, the evidence of McMillan's guilt was very strong, although it probably cannot be deemed "overwhelming," as the strength of the State's evidence arguably was undermined in certain areas. We will review it in some detail, but the big picture is strongly in the State's favor. McMillan was the last person known to have been with Jamison. McMillan also was the person who found Jamison's body, and McMillan had a great deal of blood on himself when police arrived. And there was Jamison's blood on the blade of a pocketknife in McMillan's pocket, a knife that—in his pocket—was in a closed position.

The State's case was weakened by its failure to test some evidence for blood or DNA, by blood evidence that was inconsistent with McMillan committing the crime, and by the defense's cross-examination of the State's blood-spatter expert. When the police transported McMillan to the station, they placed a paper bag under him to prevent the blood on his clothes from transferring to the patrol car since McMillan indicated that he had gotten the blood on him earlier that morning. The officers saw no blood transferred to the bag, supporting an inference that McMillan had gotten the blood on him well before he claimed to have checked Jamison's body. But the paper bag wasn't tested for traces of blood, wasn't photographed, and wasn't preserved; the officers admitted the bag was a precaution to prevent the patrol car from getting dirty, not an evidentiary collection. Additionally, although Jamison had blood all over his hands when the police arrived, the blood was not DNA tested; neither were the blood spatters on his baseball cap, traces of blood found on the lockbox, or the second knife found in the investigation (either in McMillan's bedroom or on his person) that tested positive for blood.

Another strong piece of evidence in the State's favor was the fact that Jamison's blood was found on the bottom of both of McMillan's socks, which the officers thought was odd since McMillan said that he didn't remove his shoes when checking Jamison's vital signs. Additionally, no blood was seen on the inside of McMillan's shoes,

indicating that the blood on the socks had to be dry before McMillan put his shoes on. McMillan's explanation for how his socks got bloody was suspect; he said that he had athlete's foot and would scratch his feet with a knife, yet a few days after the murder, the officers saw no injuries on McMillan's feet. And he presented no explanation for how the blade of his folding pocketknife got bloody.

But McMillan's shoes had dark interiors and they weren't chemically tested to see if traces of blood were present. Furthermore, the investigators found bloody shoe—not sock—prints around Jamison's body and down the mobile home's hallway to the bathroom. Jamison was ruled out as a contributor because he had no blood on the bottom of his socks, and the officers and paramedics were also ruled out since they testified that they were vigilant about not disturbing the crime scene. And the pair of shoes found under the kitchen table had no visible blood on the soles, just on their upper portions and laces.

The blood-spatter expert's testimony was also a key to the State's prosecution. The expert testified that the blood on McMillan's clothes was caused by more than the casual contact with Jamison's body that McMillan testified to. But she admitted that her conclusions didn't take into consideration McMillan's testimony that he lifted Jamison's shirt. Cross-examination also questioned her conclusion that the blood left Jamison's body while he was still alive and that McMillan therefore had to be present when Jamison was being wounded. She said that the spatters were expirated blood—blood coming out of the body by air. Yet she admitted that expiration was not the only way to create the blood pattern on McMillan's clothes. Another way—impact collision—could have occurred after Jamison had died, and she could not rule out an impact collision given the evidence before her. In addition, the expert saw air bubbles (consistent with expirated blood) in the spatter on the oven, but she did not see air bubbles in the blood on McMillan's clothes. And no traces of blood were found in McMillan's bedroom or bathroom.

Cross-examination of the coroner also raised questions about the State's case. The coroner couldn't tie the alleged murder weapon (the pocketknife) to Jamison's wounds as nicely as the State

would've liked. Jamison had multiple defensive wounds on both of his hands and forearms. Some of the stab wounds had pierced his heart and lungs, and his tongue was intentionally cut. The coroner said that the pocketknife had a 4½-inch blade that was 1¾-inch wide, yet he said that one stab wound was only ½-inch wide. Yet the coroner did say that the knife could have caused Jamison's wounds based on the notion that the blade was long enough to cause the deep wounds.

The defense also presented its own witnesses; their cumulative testimony showed that someone else could have potentially committed the crime. Angel Hollenbeck, Jamison's former roommate, testified of her whereabouts on the night of the crime—she was camping near Topeka. The police were able to confirm that she was at a meeting in Topeka the night of June 30 until at least 9 p.m. and in Topeka again on the afternoon of July 1, but they could not explain where she was between those times. She also told the police that she had stopped at a convenience store near the campground the night of June 30; but when the officers viewed the security tapes for that night, they didn't see her. Additionally, she claimed that her permanent residence was at the Topeka Rescue Mission during this time, but she did not register to live at the Mission until after the murder occurred. The State did ask if she had killed Jamison, and she replied that she hadn't.

The State tried to capitalize on McMillan's conflicting stories about what he remembered the night of June 30. At one point, he told the police that the last thing he remembered was playing dominoes and then finding Jamison the next morning—nothing else. He had also told the officers that he remembered going home, waking up in his bed the next morning, and then going to Jamison's trailer. McMillan's roommate, Mark Senart, bolstered the latter account. Mark testified that McMillan came home at 11:30 p.m. on June 30, and that the two talked for a bit before McMillan went to his bedroom. Mark didn't hear anyone leave the trailer after that, but he also said that he was playing a loud video game and that McMillan had an exterior door in his bedroom that Mark might not have heard. Still, McMillan never told the police that he spoke with Mark—just that he went straight to bed.

Jamison's next-door neighbor said that he heard a truck pull up outside his window about 12:30 the morning of July 1; the truck was red. The neighbor couldn't tell if the occupant went inside Jamison's trailer but said that the truck was there for about 30 minutes. He said that he'd seen a red truck in front of Jamison's trailer before. On cross-examination, however, the State cast doubt on the neighbor's credibility. The neighbor said that his windows were shut and that he was playing a video game that required a lot of attention. He also admitted to not getting up to actually look out the window. Further, when he was questioned by the police on July 2, he had said that he hadn't noticed anyone next door the night before.

Even though the State's evidence against McMillan wasn't overwhelming, it was quite strong, and the statements complained of were neither gross nor flagrant violations nor the result of ill will. We conclude that the improper reasonable-doubt explanation did not prejudice McMillan.

2. *The District Court Properly Excluded Hearsay Testimony from Two Potential Defense Witnesses that Jerald Shirack Admitted to Killing Jamison.*

To support his defense at trial that someone else killed Jamison, McMillan wanted to admit the testimony of two people who allegedly heard a man named Jerald Shirack take responsibility for Jamison's death; the defense could not locate Shirack to subpoena him.

The first witness was Angela Londeen, who would have testified that she overheard Shirack say that the police had the wrong person in jail and then, later in the same conversation, that he could get away with anything. The second was Cody Diehl; he would have testified that he overheard Shirack say that someone in Abilene would be calling the police to report a murder and that Shirack and that person would meet, split some of Shirack's money, and then "take off." The district court excluded the evidence as unduly prejudicial hearsay evidence.

McMillan argues that the exclusion denied him his right to a fair trial because he wasn't able to present his defense that someone

else killed Jamison. The State recognizes the defendant's important right to present his defense but maintains that the right is not unlimited and is subject to the rules of evidence. The State maintains that the testimony was speculative and unreliable so that its prejudice far outweighed any probative value.

A defendant has a right to present his or her theory of defense; excluding evidence that is an integral part of that theory violates the defendant's constitutional right to a fair trial. *State v. White*, 279 Kan. 326, 331, 109 P.3d 1199 (2005). Although the district court's evidentiary rulings are typically reviewed by this court for abuse of discretion, the question of whether the exclusion violated a defendant's constitutional rights is subject to unlimited review because the district court necessarily abuses its discretion when it makes an error of law and the exclusion impacts McMillan's constitutional rights. See 279 Kan. at 332. If it were error to exclude the evidence, then reversal would be required unless the error was harmless, meaning that this court is willing to declare beyond a reasonable doubt that the error had little, if any, likelihood of changing the trial's outcome. *State v. Martinez*, 288 Kan. 443, 450, 204 P.3d 601 (2009).

Angela's and Cody's statements are hearsay because they recount Shirack's out-of-court statements and are offered to prove that Shirack took responsibility for Jamison's death. K.S.A. 60-460 ("Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence."). Hearsay is generally inadmissible. See K.S.A. 60-460. McMillan admits that the statements are hearsay, but he contends that they are admissible under the declarations-against-interest exception in K.S.A. 60-460(j).

The declarations-against-interest exception allows hearsay statements that, when made, "so far subjected the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true." K.S.A. 60-460(j). Confessing to having committed a crime is a declaration against interest. *State v. Meinert*, 31 Kan. App. 2d 492, 495, 67 P.3d 850, *rev. denied* 276 Kan. 972 (2003). In *Meinert*, the defense tried to introduce someone else's

admission that he, not the defendant, had assaulted the victim; the district court excluded the testimony. This court found that the exclusion was error. 31 Kan. App. 2d at 495. Similarly, in *State v. Campbell*, 29 Kan. App. 2d 50, 63-64, 23 P.3d 176 (2001), this court found that the district court improperly excluded a third party's admission to killing the victim. In *Campbell*, the third party told a fellow inmate the details of how had he killed the victim.

But in *Meinert* and *Campbell*, the declarants gave specific details about the crime they confessed to—names, dates, and places—that coincided with the crime that the defendants were charged with. *Meinert*, 31 Kan. App. 2d at 495; *Campbell*, 29 Kan. App. 2d at 64. Such a nexus or connection was missing in this case. The statements that Angela overheard mentioned nothing that would link Shirack's statements to Jamison's death, especially when the statements were separated by time within the same conversation. Cody's testimony, however, did tie Shirack's statement to a murder in Abilene. But again, the statements have little nexus to Jamison's murder and in fact reference what would be occurring after Cody heard them on July 1 ("going to call the police" and "going to meet" and "going to take off"), not what occurred before then, including Jamison's murder. Furthermore, Cody wasn't even sure the speaker was Shirack: Cody said it was dark and he thought that it was Shirack only because the person had long hair, a beard, and looked like Jesus.

Shirack's statements from Angela's and Cody's testimony would not clearly subject him to criminal liability—they did not affirmatively show that he had confessed to murdering Jamison. Therefore, they do not meet the declaration-against-interest hearsay exception, and the district court properly excluded them. Their exclusion likewise did not prevent McMillan from pursuing his theory of defense. He still presented the testimony of others and cross-examined the State's witnesses in a manner designed to show that someone else (although not Shirack specifically) committed the crime.

3. *The District Court Did Not Err by Not Giving a Voluntary-Intoxication Instruction Because McMillan Explicitly Rejected*

*this Defense at Trial and the Instruction Would Have Been Inconsistent with His Admonition that He Didn't Commit the Crime.*

McMillan argues on appeal that the district court should have instructed the jury that voluntary intoxication can sometimes be a defense to a crime. But because McMillan is challenging the district court's failure to include an instruction he did not request, he has to show clear error, meaning that not only did the district court err but that there also is a real possibility that the jury would have rendered a different verdict had the instruction been given. See K.S.A. 22-3414(3); *State v. Martinez*, 288 Kan. 443, 451-52, 204 P.3d 601 (2009). McMillan has not met that burden in this case.

McMillan was charged with intentional second-degree murder, which requires proof that the defendant intended to kill. K.S.A. 21-3402(a). Voluntary intoxication operates as a defense to that crime if it prevents the defendant from forming the necessary intent to kill. *State v. Jones*, 283 Kan. 186, 209, 151 P.3d 22 (2007); *State v. Hayes*, 270 Kan. 535, 542-43, 17 P.3d 317 (2001); PIK Crim. 3d 54.12-A. McMillan argues that the district court should have given a voluntary-intoxication instruction because the jury could have found that he did not intend to kill Jamison because he was too intoxicated.

Before a defendant is entitled to an instruction on a theory of defense, evidence in support of that theory must exist and must be sufficient for a rational fact-finder to find for the theory after viewing the evidence in the defendant's favor. *State v. Anderson*, 287 Kan. 325, 334, 197 P.3d 409 (2008). In this case, evidence was presented that McMillan was intoxicated the night of the crime. McMillan told the officers that he had been drinking that night, and officers found an empty bottle of whiskey in Jamison's trash can and two glasses on the kitchen table, one of which contained alcohol.

But the State properly questions the propriety of giving a voluntary-intoxication instruction when McMillan did not raise it as a theory of defense at trial. Although a defendant may present inconsistent theories of defense, it doesn't mean that the defendant

is entitled to an instruction on every defense theory that is supported by some evidence. *State v. Trussell*, 289 Kan. 499, 505, 213 P.3d 1052 (2009). District courts "should not interfere with a defendant's chosen defense theory by giving an instruction which neither party requested and which may undermine defendant's chosen theory." 289 Kan. at 505.

Throughout the entire trial in this case, McMillan maintained that he did not commit the crime; it was only during closing argument that his counsel alluded to another theory of defense: that the offense was committed upon sudden rage or quarrel. But McMillan never argued that he was so intoxicated that he couldn't have intended to kill Jamison. What's more, the defense attorney explicitly said at the jury-instruction conference—after all the evidence had been presented—that the defendant was not claiming an intoxication defense: "[W]e are not making claim of intoxication. We've not asked for an intoxication defense." It was therefore appropriate for the district court to not give a voluntary-intoxication instruction when the State didn't request one and the defense explicitly said that it would not rely on that defense.

Even if it had been error to not give the instruction, we find no real possibility exists that the jury would've rendered a different verdict. The evidence did show that McMillan had been drinking. But no evidence was presented that would've shown that McMillan was so intoxicated that he wasn't aware that he was killing Jamison. And the gruesome nature of the crime indicates otherwise: Jamison suffered 56 knife wounds all over his body, during which time he was apparently trying to defend himself, and the coroner found that his tongue had intentionally been cut.

Finally, McMillan tries to say that the absence of a motive to commit the crime infers an absence of intent to kill. But the jury was given a possible motive: Jamison might have "come on" to McMillan and McMillan might have reacted violently. Officers found women's underwear, women's earrings, and an unidentifiable sex toy in Jamison's bedroom, and Jamison was wearing a pair of women's underwear when he was killed. Thus, McMillan has not shown that the district court's failure to give a voluntary-intoxication instruction was clearly erroneous.

*4. The District Court Erred by Not Giving a Nonexclusive-Possession Instruction, but this Error Does Not Require Reversal Because the Jury's Verdict Would Have Been the Same Had It Been Given.*

The jury was given the standard possession instruction: Possession of a controlled substance means that the defendant must know that the substance is present and intend to exercise control over it. See PIK Crim. 3d 67.13-D. McMillan contends that this wasn't enough and that the district court should have included the optional nonexclusive-possession paragraph in the pattern instruction because he presented evidence that one of his roommates had a key to the locked box in which the marijuana, rolling papers, and tin container were found.

Again, because McMillan did not request the instruction, we do not reverse a jury's verdict unless he shows clear error. See K.S.A. 22-3414(3); *Martinez*, 288 Kan. at 451-52. First, it's important to note that the nonexclusive-possession instruction explicitly discusses the possession of controlled substances, not drug paraphernalia. PIK Crim. 3d 67.13-D; see *State v. DuMars*, 33 Kan. App. 2d 735, 751, 108 P.3d 448, *rev. denied* 280 Kan. 986 (2005). But the usage notes to the pattern instructions governing possession of drug paraphernalia refer to PIK Crim. 3d 67.13-D for the definition of possession. PIK Crim. 3d 67.17. The concepts involved in possession of either drugs or paraphernalia are the same. So this court can consider McMillan's assertion of error as to both the drug-paraphernalia and drug-possession charges.

The nonexclusive-possession instruction is given when the defendant doesn't have exclusive possession over the premises or vehicle in which an illegal substance is found. PIK Crim. 3d 67.13-D. Here, McMillan did not exclusively possess the mobile home— he lived with three other people. And although the items were found in a locked box under McMillan's personal bed in the mobile home, evidence was presented that another one of McMillan's roommates, Mark Senart, may have had a key to the box. Therefore, the district court erred in not giving the nonexclusive-possession instruction.

Nonetheless, McMillan cannot show clear error because there is no reasonable possibility that the jury would have rendered a different verdict had the instruction been given. The nonexclusive-possession instruction includes seven factors for the jury to consider when determining whether the defendant possessed the incriminating items. PIK Crim. 3d 67.13-D. But the district court should only instruct on those factors that are supported by evidence. See PIK Crim. 3d 67.13-D Notes on Use; *State v. Douglas-Keough*, 2009 WL 1766238, at *4 (Kan. App. 2009) (unpublished opinion). Here, the only factors that are supported by evidence are whether the items were found in plain view and whether the defendant's personal belongings were found near the items. And in this case, both factors support the conclusion that McMillan exclusively possessed the paraphernalia and the marijuana.

The items were not in plain view and were not found in the mobile home's common areas. They were found in a locked box; the locked box belonged to McMillan and was under his personal bed in the mobile home. The location and secured status of the box strongly suggest that McMillan knowingly possessed them, and none of the factors that would have been listed for consideration in the nonexclusive-possession instruction suggest otherwise. Therefore, even if the district court had properly instructed the jury on nonexclusive possession, the jury would have returned the same verdict—guilty.

5. *The District Court Erred when It Told the Jury that the Zig Zag Rolling Papers Were Drug Paraphernalia, but Reversal Is Not Required Because the Proper Instruction Would Not Have Changed the Jury's Verdict.*

McMillan asserts one more error in the jury instructions. He insists that the instruction defining drug paraphernalia was improper because the definition included an item not specifically identified as paraphernalia in Kansas' statutes—Zig Zag rolling papers. McMillan contends that the district court should have had the jury determine whether the Zig Zag papers were paraphernalia using the factors listed in Instruction 10, which is PIK Crim. 3d 67.18-C. The State responds that no error occurred because In-

struction 10 listed the factors for the jury to consider when deciding whether an item is drug paraphernalia. Once again, because McMillan did not object to the instruction at trial, he must show clear error to set aside the jury's verdict. See K.S.A. 22-3414(3); *Martinez*, 288 Kan. at 451-52.

McMillan is correct: Kansas' statutory definition of drug paraphernalia includes "wired cigarette papers," and it hasn't been established in this case that Zig Zag papers meet that definition. K.S.A. 2007 Supp. 65-4150(c)(12)(O). Thus, the district court should have told the jury that drug paraphernalia includes wired cigarette papers, leaving it up to the jury to determine whether Zig Zag papers were drug paraphernalia. While the State is correct that Instruction 10 did tell the jury the proper factors to consider when determining whether an item is drug paraphernalia, Instruction 9 expressly said that the Zig Zag papers were drug paraphernalia, so Instruction 10 did not cure the error.

Nevertheless, we agree with the State that there is no real possibility the jury's verdict would have been different had the jury been left to determine whether the Zig Zag papers were paraphernalia under Instruction 10, so reversal is not required. Instruction 9 told the jury that paraphernalia included products used for introducing a controlled substance into the human body; Instruction 10 told the jury to consider an item's proximity to controlled substances and testimony concerning the object's use when making its determination. See K.S.A. 2007 Supp. 65-4150(c)(12); K.S.A. 2007 Supp. 65-4151(d), (n). The Zig Zag papers were found in a locked box that contained other items of drug paraphernalia. More to the point, *other items* of drug paraphernalia were also found, including two pipes—a wooden "one-hitter" and a metal pipe—that an officer said were used to smoke marijuana. No testimony suggested any other use for the pipes. Therefore, no real possibility exists that the jury would not have convicted McMillan of possession of drug paraphernalia even if a proper instruction had been given. The district court did not commit clear error, so reversal is not required.

6. *The District Court Did Not Err in Using McMillan's Criminal History to Calculate His Sentence Because the Kansas Supreme Court Has Deemed the Practice Constitutional.*

McMillan's next argument is that the district court violated his constitutional rights when it used his criminal history to calculate his sentence without following the procedural safeguards of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). The State argues in response that prior convictions are expressly excluded from *Apprendi's* rule.

*Apprendi* requires that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum . . . be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. As the State pointed out, a defendant's prior convictions are explicitly excluded from this requirement. See 530 U.S. at 490. The Kansas Supreme Court has recognized the continuing validity of this prior-conviction exception to *Apprendi's* requirements. See *State v. Fewell*, 286 Kan. 370, 395-96, 184 P.3d 903 (2008); *State v. Ivory*, 273 Kan. 44, 46-47, 41 P.3d 781 (2002). The district court did not err when it used McMillan's criminal-history score to calculate his sentence.

7. *The District Court Did Not Err when It Failed to Put the Aggravating Sentencing Factors Before the Jury to Be Proved Beyond a Reasonable Doubt Because the Kansas Supreme Court Has Deemed the Practice Constitutional.*

McMillan's final argument is that the district court further violated his constitutional rights by giving him the aggravated sentence for second-degree murder without submitting the aggravating factors to the jury to be proved beyond a reasonable doubt. Our sentencing guidelines provide three possible sentences in each applicable grid box: a mitigated (or lower) sentence, a standard sentence, and an aggravated (or higher) sentence. The district court gave McMillan the aggravated sentence of 203 months for second-degree murder rather than the standard sentence (195 months) or the mitigated sentence (184 months). McMillan contends that this violates the right to a jury trial based on *Cunningham v. California*, 549 U.S. 270, 274-75, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007). In that case, the United States Supreme Court held it unconstitutional to impose a sentence above the statutory maximum based on facts not proven by the jury.

But once again the Kansas Supreme Court has considered and rejected McMillan's argument: because an aggravated sentence is still within the maximum statutory sentence, imposing it does not violate the holding of *Cunningham. State v. Johnson*, 286 Kan. 824, 851-52, 190 P.3d 207 (2008). The district court did not violate McMillan's constitutional rights when it imposed the aggravated sentence.

The judgment of the district court is therefore affirmed.

\* \* \*

MALONE, J., concurring: I respectfully concur in the result, but I would find no prosecutorial misconduct in the closing argument. I agree with the majority that the prosecutor did not commit misconduct by referring to some widely known shooting incidents only to make the point that the State did not need to prove motive. As for the prosecutor's comments on the State's burden of proof, the comments are set forth in their entirety in the majority opinion as follows:

"[The Prosecutor:] The Court instructed you in Instruction No. 13 on—on reasonable doubt, and I want to discuss that with you.

. . . .

"I want to comment briefly on the reasonable doubt statute. The State filed this case. The State has to prove the case. You know, that's the law, and that's fair. We have to prove the case such that there is no reasonable doubt as to the truth of the elements that we've alleged.

"Now, the Court has given you the instructions on the elements of each charge, and we'll get into those later on. But that's the burden the State has.

"A lot of people have a misconception that we have to prove it—a case beyond any and all doubt. Beyond a shadow of a doubt. That is not our burden, ladies and gentlemen. The fact is and the law is, you can have a doubt as to the claim or a claim made by the State of Kansas. But if that doubt is not reasonable, then, based upon the evidence, you must find the defendant guilty.

"And there's no percentage on this. It's not set forth in the law. It's not saying, well, you got to reach 51 percent, or you got to reach this percent or that percent. There's no such thing.

"And, basically, what it comes down to is, if you, in your hearts and in your minds, after hearing all the evidence and taking all the evidence into consideration, you feel in your hearts and in your minds that the State has proven each and every element of the crime charged, you have reached that reasonable doubt standard and you must find the defendant guilty.

"And we feel comfortable, based upon the evidence that you heard from the—from the witness stand and the physical evidence that was introduced into evidence that you're going to find the defendant guilty beyond a reasonable doubt in this case."

The prosecutor began his comments by referring the jury to Instruction 13 which was substantially the same as the approved PIK instruction on burden of proof, presumption of innocence, and reasonable doubt. See PIK Crim. 3d 52.02. Then the prosecutor informed the jury that the State had the burden "to prove the case such that there is no reasonable doubt as to the truth of the elements that we've alleged." In the same sentence in which the prosecutor briefly referred to the hearts and minds of the jurors, the prosecutor indicated that the State must prove "each and every element of the crime charged." Finally, and most importantly, the prosecutor reminded the jury that the verdict must be "based upon the evidence that you heard . . . from the witness stand and the physical evidence."

In my experience, an appellate court finding of prosecutorial misconduct is the kind of pronouncement that most prosecutors and the general public view quite seriously. In this instance, upon reviewing the prosecutor's comments in their entirety, I find no misconduct committed by the prosecutor in the closing argument.