NOT DESIGNATED FOR PUBLICATION

No. 114,116

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ANTHONY W. BOYD,
*Appellant*.

MEMORANDUM OPINION

Appeal from Lyon District Court; W. LEE FOWLER, judge. Opinion filed July 15, 2016. Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Amy Aranda*, assistant county attorney, *Mark Goodman*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, C.J., GREEN and GARDNER, JJ.

*Per Curiam*: Anthony W. Boyd appeals his convictions of six counts of promoting obscenity to minors and four counts of aggravated indecent liberties with a child when the offender was over 18 years of age and the child was under 14 years of age. Boyd claims the district court committed reversible error when it instructed the jury on the elements of the charges against Boyd that included the birthdates of the alleged victims. He also claims he was denied a fair trial based on prosecutorial misconduct in the closing argument. Finding no reversible error, we affirm the district court's judgment.

1

FACTUAL AND PROCEDURAL BACKGROUND

Debbie Redeker was a fourth grade teacher at Olpe Elementary School. On January 6, 2014, Redeker taught a personal safety program to the class. After Redeker introduced the program to the students, she provided them an index card on which they could ask for help if they were experiencing any problems. M.P., a student in Redeker's class, wrote on her index card that her "Grandpa Tony" touched her "in bad spots" and made her watch bad movies. It was later determined that "Grandpa Tony" was the defendant, Boyd, who resides with M.P.'s grandmother, Stephanie Turner.

Redeker made copies of the index card and provided a copy to the school principal and to the school guidance counselor, Carolyn Davis. Later in the day, Redeker asked M.P. if she wanted to talk to Davis about what she had written on her card. Davis met individually with M.P. During the meeting, they talked about Grandpa Tony, the bad movies he made M.P watch, and how she was being touched in bad places. M.P. told Davis that her cousin, I.B., and younger brother, D.P. were also involved in the incidents. Davis reported M.P.'s statements to the Department of Children and Families (DCF).

Kayla Delgado, a special investigator with DCF, conducted forensic interviews of all three children. M.P. told Delgado that Boyd made her watch bad movies, touched her private parts where her swimming suit would cover, and made her touch him in bad spots. M.P. said she told Boyd to stop but he would not listen. M.P. stated that she was 8 or 9 years old when this happened.

M.P. also told Delgado that Boyd would make her drink something that she had seen in the bad movies. The liquid was kept in a box in a garage, and Boyd squirted the liquid onto the children's fingers and made them lick it. M.P. described that after Boyd made the children watch a bad movie, he made M.P. and I.B. do what they saw in the

2

movie and touch each other in bad spots. This happened on multiple occasions, and D.P. and I.B. were present every time.

Delgado also interviewed D.P. D.P. told Delgado that his grandpa, Boyd, made him watch bad movies at Boyd and Turner's house. D.P. said that he and M.P. sometimes left the room and did not see the movies, but I.B. could not leave. D.P. said he was 7 years old the first time Boyd made him watch the movies. D.P. also said that Boyd made him drink a bad tasting clear liquid from a clear plastic bottle that was stored in a black box in a shed. Boyd would place the liquid on D.P.'s finger and make him taste it.

Delgado also interviewed I.B. I.B. told Delgado he was 8 years old. I.B. appeared nervous and was quick to say "no" when asked if he had ever been touched by Boyd.

A DCF special investigator also spoke with A.P., M.P. and D.P.'s mother. A.P. described an incident that occurred several years earlier with Boyd when A.P. was 14 years old. A.P. told the investigator that she woke up one night and saw Boyd sitting on the floor beside her bed with his hand in her pants touching her vagina. A.P. slapped Boyd's hand away and stayed awake until he left the room. A.P. reported the incident to her mother, Turner, but Turner did not believe her. A.P. never reported the incident to anyone else and Boyd never touched her again.

Lyon County Sheriff's Detective Jarrod Fell was assigned to investigate the case. Fell observed the interviews of M.P. and D.P., and he also took a statement from A.P. Based on his investigation, Fell determined that I.B., who lived with Boyd, needed to be placed in police protective custody. When Fell took I.B. into police protective custody, he also arrested Boyd.

After Boyd was arrested, Fell provided him with *Miranda* warnings and interviewed him. Boyd stated that he understood his *Miranda* rights and agreed to speak

3

with Fell. Boyd said his birthdate was September 11, 1956. Boyd admitted to Fell that he asked the children to taste massage lotion that he kept in the shed. Boyd also admitted that he watched pornography and the children may have accidentally seen it on the television, but he said he never forced them to watch.

When asked about the allegations that he had M.P. touch him, Boyd said that he sleeps on the floor and sometimes the children lay next to him and M.P. could have touched his penis while he was asleep. Boyd also said his hand could have slipped down to M.P.'s vaginal area while they were sleeping on the floor. Boyd also said he may or may not have put his hand in A.P.'s pants when she was 14 years old. Ultimately, Boyd said that things happen accidentally and then they stop, that these "incidents" could have happened, and that "things happen and you apologize" and he had apologized.

On January 10, 2014, Fell applied for and received a search warrant for Boyd and Turner's residence. Fell executed the search warrant the same day. When he arrived at the residence, Turner was coming out of a shed with a brown briefcase. Fell stopped Turner and searched the briefcase. It contained pornographic materials, pictures, and Polaroids. Turner told Fell that she had already gone through the house and removed the pornography and any other evidence. Turner told Fell the items she collected from the house were in the trunk of the car and allowed him to look at and collect the items. In the trunk, Fell found several pornographic magazines and DVDs. In the shed, Fell found a black folder that contained pornographic materials and magazines and personal items along with letters with Boyd's name on them.

On January 14, 2014, the State charged Boyd with six counts of promoting obscenity to minors and four counts of aggravated indecent liberties with a child when the offender was over 18 years of age and the child was under 14 years of age. The jury trial commenced on January 20, 2015. M.P. testified at trial that she was born on September 20, 2003. M.P. confirmed that she wrote on the index card provided during

4

personal safety training that Boyd had touched her in bad places and made her watch videos. Specifically, M.P. testified that Boyd would watch movies that showed women and men who would take off their clothes and touch each other's private parts. M.P. did not like watching these movies and tried to look away. Sometimes when they watched the movies, Boyd would have M.P., D.P., and I.B. go into the shed and he would put a liquid from a bottle on their fingers.

M.P. also testified that Boyd touched her over her clothes in her private areas where the bottom of her swimsuit would have covered. M.P. testified that this occurred on different days than when they watched the movies, and D.P. and I.B. were present when she was touched. M.P. testified that she was 8 or 9 years old when this happened.

D.P. testified that he was born on November 23, 2004. D.P. testified that when he and M.P. were playing with I.B., Boyd would make them watch "bad movies." These movies showed adults with their clothes off touching each other's private parts. When Boyd put the movies on, the children would try to leave but could not because the door was locked. D.P. testified that he told Boyd he did not want to watch the movies, but Boyd still made him watch. D.P. testified that Boyd put a liquid from a little bottle in the shed on his hand for him to taste. D.P. also said that M.P. told him that Boyd touched her in a bad place, which D.P. thought was a private area where a swimsuit would cover. D.P. was 7 or 8 years old when this happened.

Jennifer Williams, a therapist at the Mental Health Center of East Central Kansas, testified at trial. She had provided therapy for I.B. since February 26, 2014. During therapy, I.B. revealed to Williams that he was removed from Turner and Boyd's home because he was exposed to pornographic videos and sexual abuse. I.B. told Williams that the videos showed naked adults "humping" and having sex. I.B. also told Williams that Boyd would have I.B., M.P., and D.P. reenact what occurred in the movies. M.P. was always involved because she was the only girl, and Boyd would decide whether I.B. or

5

D.P. would "hump" M.P. The children would take their clothes off, Boyd would touch their private parts with his hands, and the children would touch each other's private parts with their hands. Boyd also had the children touch his private parts and would touch I.B.'s penis throughout the movies.

I.B. testified that he was born on October 1, 2005. I.B. lived with Boyd and Turner, and M.P. and D.P. would visit him and stay the night at times. When M.P. and D.P. would come over, Boyd would play inappropriate movies involving sex. In the movies, adults had their clothes off and were "humping" and touching each other's penis and vagina. I.B. also testified that Boyd asked I.B., M.P., and D.P. to act out what was in the movies. This required I.B., M.P., and D.P. to "hump" each other and touch each other's private areas.

A.P. testified that M.P. was born on September 20, 2003, and D.P. was born on November 23, 2004. Delgado and Fell testified at trial. Delgado's interviews of the children and Fell's interview of Boyd were admitted and shown to the jury. Boyd did not testify at trial. However, he did call various witnesses to testify about his relationship with M.P., D.P., and I.B.

Prior to trial, Boyd submitted proposed jury instructions that provided the elements of the charges against Boyd and included M.P., D.P., and I.B.'s birthdates. At trial, the district court submitted Boyd's proposed instructions to the jury, and Boyd did not object to any of the instructions. The jury convicted Boyd of all charges. The district court held a sentencing hearing on May 6, 2015. The district court denied Boyd's departure motion, sentenced him to a controlling sentence of life imprisonment with a minimum of 25 years' imprisonment, and ordered lifetime postrelease supervision and electronic monitoring. Boyd filed a timely notice of appeal.

Boyd first claims the district court committed reversible error when it instructed the jury on the elements of the charges against Boyd that included the birthdates of the alleged victims. Each of the charges for promoting obscenity or aggravated indecent liberties required the State to prove that M.P., D.P., and I.B. were either under the age of 18 (promoting obscenity) or under the age of 14 (aggravated indecent liberties). Boyd claims that when the district court provided the jury with the children's birthdates, it directed a verdict as to the element of the victim's age. Boyd acknowledges that he did not object to the jury instructions and, in fact, his proposed instructions to the district court included the children's birthdates.

The State concedes that providing the birthdates in the jury instructions was error. However, the State argues that this error does not warrant reversal because there was ample evidence presented to the jury that each of the three children were under 14 years of age when the offense occurred and Boyd did not contest or challenge any of this evidence. Thus, the State argues that the jury instructions were not clearly erroneous and do not warrant reversal of Boyd's convictions.

A party cannot claim error for the district court's giving or failing to give a jury instruction unless (1) the party objects before the jury retires, stating distinctly the matter to which the party objects and the grounds for the objection; or (2) the instruction or the failure to give the instruction is clearly erroneous. *State v. Smyser*, 297 Kan. 199, 204, 299 P.3d 309 (2013). The appellate court uses a two-step process in determining whether the challenged instruction was clearly erroneous. First, the court must consider whether there was any error at all by considering whether the instruction at issue was both legally and factually appropriate based on the entire record; (2) if the court finds error, it must assess whether it is firmly convinced the jury would have reached a different verdict without the error. *State v. Clay*, 300 Kan. 401, 408, 329 P.3d 484 (2014).

An appellate court need not consider whether the giving of or failure to give a jury instruction was clearly erroneous when the challenge is precluded by the invited error rule. *State v. Jones*, 295 Kan. 804, 811-12, 286 P.3d 562 (2012). Under the invited error rule, a litigant may not invite error and then complain of the error on appeal. *State v. Verser*, 299 Kan. 776, 784, 326 P.3d 1046 (2014).

Here, Boyd included the birthdates of M.P., D.P., and I.B. in his proposed jury instructions. In fact, the jury instructions given by the district court on the elements of the charges were identical to Boyd's proposed instructions. At the jury instruction conference, the district court requested the parties to make any objections to the proposed instructions, but Boyd did not object to the instructions that included M.P., D.P., and I.B.'s birthdates. Because Boyd proposed the instructions containing the children's birthdates and did not object to these instructions at the jury instruction conference, the invited error rule precludes him from challenging the instructions on appeal.

Boyd cites *State v. Brammer*, 301 Kan. 333, 343 P.3d 75 (2015), and claims the invited error rule does not apply here because "the proposed instructions are insufficient to advise the district court of the desires of the defense for a particular instruction." However, Boyd's reliance on *Brammer* is misplaced. In that case, the defendant failed to object to certain instructions at the jury instruction conference. On appeal, the defendant argued that he had preserved his objection to the jury instructions by submitting proposed jury instructions prior to the trial that differed from the instructions given by the court. Our Supreme Court rejected the defendant's argument and concluded that the defendant had failed to preserve his objection to the instructions because he did not make the objection at the jury instruction conference. 301 Kan. at 340-41. *Brammer* evaluates whether a defendant sufficiently objected to a jury instruction to preserve it for appellate review, not whether the defendant invited the instructional error. 301 Kan. at 339-41.

8

Even though we find that Boyd has invited any error on the jury instructions, we will briefly review the merits of his claim. First, as the State concedes, the elements instructions in this case were erroneous because they were legally inappropriate. For the charge of aggravated indecent liberties with a child under 14 years of age, PIK Crim. 4th 55.121 provides in relevant part: "At the time of the act, *insert initials of child* was less than 14 years old. The State need not prove the defendant knew the child's age." For the charge of promoting obscenity to a minor, PIK Crim. 4th 64.020 provides in relevant part: "*Insert initials of child* (the recipient of the obscene [material] [device]) (a member of the audience of the obscene performance) was less than 18 years of age. [The State need not prove defendant knew the child's age.]"

The instructions provided by the district court complied with the PIK instruction provisions for age except that they also included the children's initials and dates of birth. Inclusion of the children's birthdates was legally inappropriate because it was a finding of fact that directed a conclusion on the element of whether the children were under either 14 or 18 years of age. See *State v. Knight*, No. 105,092, 2012 WL 2325849, at *5 (Kan. App. 2012) (unpublished opinion) (finding that providing child victim's date of birth in instruction was a factual finding that directed a conclusion against the defendant on the element of the victim's age).

However, this error does not require reversal of Boyd's convictions. There was overwhelming and undisputed evidence of the children's ages presented at trial. The children told Delgado their age during the interviews, A.P. provided the birthdates of M.P. and D.P., and all three children testified to their birthday. Further, the jurors observed each of the children when they testified giving them a firsthand observation of the age of the children. Moreover, Boyd made no attempt at trial to dispute the age of the children. Because the evidence was overwhelming that the children were all under 14 years of age, we are not firmly convinced that the jury would have reached a different verdict without the error. See *Clay*, 301 Kan. at 408.

9

Finally, other cases from this court demonstrate that a directed verdict error, like the one here, must satisfy both prongs of the clear error rule. In *State v. Davis*, No. 109,871, 2014 WL 6909602, at *4-5 (Kan. App. 2014) (unpublished opinion), this court found that the district court erred by providing the child victim's age in the jury instructions. However, this court did not reverse the conviction because it was not firmly convinced the jury would have reached a different verdict had the instructions not provided the victim's age. 2014 WL 6909602, at *5. This court also reached a similar result in *Knight*, 2012 WL 2325849, at *5-6. Therefore, we conclude that including the children's birthdates in the jury instructions in Boyd's case was not clearly erroneous.

PROSECUTORIAL MISCONDUCT

Next, Boyd claims that he was denied a fair trial based on prosecutorial misconduct in the closing argument. Boyd argued during closing that the children's allegations were the product of improper interview techniques and coaching from family members and therefore the children's statements could not be trusted. In response, the prosecutor opened his rebuttal argument with the following statement:

"Put it on the mother. Put it on the father. Blame the interviewer. Blame the interview techniques. Blame the family. Blame the family dynamic. Use your common knowledge, because who wants to think it ever happens? Who wants to believe it will ever continue? Pick your topic. Pick Jerry Rice. Pick the NFL. Pick has to stop now. No more. Can't talk about it even before they're told to talk about it. Jerry Sandusky, priests, coaches, Penn State, Boy Scout leaders, uncles, stepfathers, stepmothers, cousins, moms, dads, teachers, then there's Jennifer Williams and the youngest of the three, [I.B.]."

Boyd argues that the reference to well-known incidents of sexual abuse was improper because it asked the jury to conclude that abuse occurred in this case despite no evidence being admitted regarding the Penn State/Jerry Sandusky scandal, the Boy Scouts' scandal, or scandals involving priests. Boyd argues that these statements were

erroneous because they referred to facts not in evidence and were designed to inflame the passions of the jury and prejudice them against Boyd.

The State responds that the comments were proper because they were made in response to Boyd's argument that the children's allegations were the product of improper interview techniques and coaching from family members. The State argues that even if the prosecutor's comments were improper, they do not amount to reversible error.

Appellate review of an allegation of prosecutorial misconduct involving improper comments to the jury requires a two-step analysis. First, the court determines whether the prosecutor's comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. If the comments were improper and constituted misconduct, the appellate court must determine whether the comments prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Roeder*, 300 Kan. 901, 932-33, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015).

In the second step of the two-step analysis, the appellate court considers three factors:  (1) whether the misconduct was gross and flagrant, (2) whether the misconduct showed ill will on the prosecutor's part, and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling. *State v. Williams*, 299 Kan. 509, 540-41, 324 P.3d 1078 (2014).

"'[A] prosecutor's improper comment or argument can be prejudicial, even if the misconduct was extemporaneous and made under the stress of rebutting argument made by defense counsel.' [Citation omitted]." *Roeder*, 300 Kan. at 934 (disavowing language in previous cases that defense provocation can justify prosecutorial misconduct). In other words, defendants do not open the door to prosecutorial misconduct. *State v. Stimec*, 297 Kan. 126, 130, 298 P.3d 354 (2013).

11

Although not cited by either party, *State v. McMillan*, 44 Kan. App. 2d 913, 242 P.3d 203 (2010), is applicable to Boyd's claim of prosecutorial misconduct because it involves an allegation of misconduct based on a prosecutor's references to high profile crimes during closing argument. In that case, the defendant was charged with murder and in closing argument the prosecutor referenced the Columbine shooting, the Virginia Tech massacre, and the Kennedy assassination to make the point that the State was not required to prove motive. This court held that these references did not constitute prosecutorial misconduct because the statements did not constitute unsworn testimony and they were not intended to inflame the passions or prejudices of the jury. 44 Kan. App. 2d at 918-19.

*McMillan* is distinguishable from Boyd's case. In *McMillan*, the prosecutor referred to well-known shootings to make the point that the State was not required to prove motive and the prosecutor was not comparing the high profile cases to the facts of the case before the jury. Here, we can discern no valid reason for the prosecutor's comments and we reject the State's argument that the comments were justified because Boyd had argued that the children's allegations were the product of improper interview techniques. Moreover, the prosecutor was attempting to make a comparison between Boyd's case and well-known cases involving sexual abuse of children.

Even if we were to conclude that the prosecutor's comments in Boyd's case constituted misconduct, we have no hesitancy in finding that the comments do not amount to reversible error. The comments in question were not gross or flagrant. The prosecutor did not repeat his references to publicized child sex scandals or emphasize them beyond the isolated comment. Also, the statements were not motivated by ill will and were not made in contradiction to any court ruling. In fact, Boyd did not object to the prosecutor's comments at trial. See *State v. Miller*, 284 Kan. 682, 720, 163 P.3d 267 (2007) (while the lack of such an objection does not preclude our review, it nevertheless may play into our examination of whether the comments were made in ill will).

12

Finally, the evidence in this case was of such a direct and overwhelming nature that any misconduct would likely have had little weight in the minds of the jurors. The jury was provided the statements M.P. made to school personnel, the statements the children made to Delgado, the statements I.B. made to Williams, and observed the children testify about the incidents firsthand. Boyd made incriminating statements to Fell about his involvement with the children. The prosecutor's fleeting references to highly publicized instances of sexual abuse of children would have had little weight in the minds of the jury as compared to the vast amounts of direct evidence supporting the charges. Thus, we conclude that Boyd was not denied a fair trial based on prosecutorial misconduct in the closing argument.

Affirmed.